**Junius Irving SCALES, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7637.**

United States Court of Appeals
Fourth Circuit.

Argued June 13, 1958.

Decided Oct. 6, 1958.

Certiorari Granted Dec. 15, 1958.

See 79 S.Ct. 289.

Telford Taylor, New York City (Mc-Neill Smith, Bynum M. Hunter, Richmond G. Bernhardt, Jr., Greensboro, N. C.; Taylor, Scoll & Simon, New York City, and Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant.

Victor C. Woerheide, Atty., Dept. of Justice, Washington, D. C. (J. Walter Yeagley, Acting Asst. Atty. Gen., James E. Holshouser, U. S. Atty., No. Wilkesboro, N. C., Harold D. Koffsky, Philip R. Monahan, Bruce J. Terris and Jerome L. Avedon, Attys., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and BARKSDALE, District Judge.

SOPER, Circuit Judge.

This appeal is taken from a judgment of conviction under the membership clause of § 2(a) (3) of the Smith Act of June 28, 1940, 54 Stat. 670, 671, which has been codified in the U. S. Code of Crimes and Criminal Procedure in the third paragraph of 18 U.S.C. § 2385, as follows:

> "Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government [1] by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, * * *."

The indictment charges that during the entire period from January 1946 up to the date of the filing of the indictment on November 18, 1954, the Communist Party of the United States has been a society and group of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence as speedily

---

1. i. e., the Government of the United States or the government of any State, Territory, District or Possession thereof.

as circumstances would permit; and that during the same period the defendant, Junius Irving Scales, in the Middle District of North Carolina and elsewhere, had been a member of the Communist Party of the United States, well knowing that it was and is a society and group of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, the defendant intending to bring about such overthrow by force and violence as speedily as circumstances would permit.

The defendant was first tried and convicted under this indictment in April 1955, and was sentenced to imprisonment for six years; and the judgment was affirmed by this Court in 227 F.2d 581. The Supreme Court of the United States granted certiorari and after argument and confession of error by the United States, under the later decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, the judgment was reversed, Scales v. U. S., 355 U.S. 1, 78 S.Ct. 9, 2 L.Ed.2d 19. At the new trial in February 1958, the jury returned a verdict of guilty and the defendant was sentenced a second time to imprisonment for six years.

█ █ The defendant's first point is a repetition of the contention, rejected by this Court on the first appeal, 227 F.2d 586–588, that the membership clause of the Smith Act is invalid on its face under the First and Fifth Amendments since it abridges freedom of speech and imputes guilt merely from association unaccompanied by unlawful conduct. It is admitted that the Supreme Court has upheld the validity of state statutes [2] which punish persons who organize or become members of a society or group formed to advocate or teach criminal anarchy; and also·that in Dennis v. United States, 341 U.S. 494,

71 S.Ct. 857, 95 L.Ed. 1137, the Supreme Court upheld the constitutionality of the advocacy and organization provisions of the Smith Act. But it is pointed out that in none of these cases were the defendants accused *only* of membership in the criminal organization, and that the statutes were held not to offend the First Amendment because they were designed to meet a clear and present danger to the state by prohibiting unlawful conduct in which the defendants had participated.

Specifically it is said that the Dennis decision was based on findings that the defendants were parties to an existing conspiracy which endangered the safety of the nation since it involved not merely the exposition of an idea but also the advocacy of unlawful action as well as personal intent on the part of the defendants to overthrow the government. Arguing that the membership clause of the Smith Act is constitutionally defective, the appellant seems to say that the clause does not require that the offender be engaged in any unlawful advocacy or party activity, either alone or in concert with other persons, but only that he be a member of the organization with knowledge of its purposes to overthrow the government by violence and hence "membership" as defined in the Act is merely the status and state of mind of a single individual and does not involve a clear and present danger to the state.

The argument is not persuasive since it fails to give proper weight either to the terms of the statute or to the Dennis decision in which §§ (2) (a) (1) and (a) (3) and § 3 of the Act were specifically held to be constitutional, or to the decision in Yates v. U. S., 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356, where the statute was interpreted and the Dennis decision was explained and approved. The terms of the membership clause are not satisfied merely by membership in a Communist group. The requirements

---

2. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Burns v. United States, 274 U.S. 328, 47 S.Ct. 650, 71 L.Ed. 1077; Whitney v. People of State of California, 274

U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Fiske v. State of Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; cf. De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278.

are that the accused be a member of a society or group who teach, advocate or encourage the overthrow of the Government of the United States by force or violence knowing the purposes of the society or group. In view of these provisions the Supreme Court in the Dennis case rejected the argument which is now presented to us in the following passage in its opinion, 341 U.S. 494, 502, 71 S.Ct. 857, 863, 95 L.Ed. 1137:

"The very language of the Smith Act negates the interpretation which petitioners would have us impose on that Act. It is directed at advocacy, not discussion. Thus, the trial judge properly charged the jury that they could not convict if they found that petitioners did 'no more than pursue peaceful studies and discussions or teaching and advocacy in the realm of ideas.' He further charged that it was not unlawful 'to conduct in an American college and university a course explaining the philosophical theories set forth in the books which have been placed in evidence.' Such a charge is in strict accord with the statutory language, and illustrates the meaning to be placed on those words. Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity in which the evidence showed these petitioners engaged."

This view was developed and explained in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356, where the Court said that it had long recognized the distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action, and that the legislative history of the Smith Act shows beyond all question that Congress was aware of this distinction and hence it could not be assumed that Congress chose to disregard a constitutional danger zone so clearly marked. The

Court therefore found it unnecessary to decide the issue in terms of constitutional compulsion and held that it was the purpose of Congress to prohibit the advocacy and teaching of concrete action for the forcible overthrow of the Government and not of principles divorced from action. Showing that the decision in the Dennis case was in harmony with this interpretation, the Court said (354 U.S. at pages 321 and 322, 77 S.Ct. at page 1078):

" * * * The essence of the Dennis holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action, by advocacy found to be directed to 'action for the accomplishment' of forcible overthrow, to violence as 'a rule or principle of action,' and employing 'language of incitement,' id., 341 U.S. at pages 511–512, 71 S.Ct. at page 868, is not constitutionally protected when the group is of sufficient size and cohesiveness, is sufficiently oriented towards action, and other circumstances are such as reasonably to justify apprehension that action will occur. * * * As one of the concurring opinions in Dennis put it: 'Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.' Id., 341 U.S. at page 545, 71 S.Ct. at page 885. There is nothing in Dennis which makes that historic distinction obsolete."

The appellant seeks to distinguish these decisions from the pending case because in them the defendants were charged with *conspiracy* to violate the teaching and organization clauses of the statute, whereas in the pending case the indictment charges the substantive offense of membership. The distinction is without significance on the issue of constitutionality. The Scales indictment charges a guilty knowledge of the illegal purposes of the organization and the

specific intent on the part of the defendant to bring them about as speedily as circumstances will permit. "No one could conceive," said Chief Justice Vinson in Dennis v. United States, 341 U.S. at page 501, 71 S.Ct. at page 863, "that it is not within the power of Congress to prohibit acts intended to overthrow the Government by force and violence." The question in any case is "whether the means [adopted by Congress] conflict with the First and Fifth Amendments to the Constitution." In that case it was expressly decided that Congress had the power as a proper means to the end to prohibit a conspiracy to overthrow the Government; and, as Chief Judge Parker pointed out in the first appeal in this case, 227 F.2d at page 587, "the membership clause of the statute is, of course, nothing more nor less than a statute denouncing and making criminal a conspiracy to overthrow the government by force and violence." It is too clear for argument that membership in an organization with knowledge of its purposes and an intent to make them effective is a joint rather than an individual undertaking which gathers its strength from an association or group of individuals inspired by a common purpose. The activities of such a group constitute a clear and present danger to the state and he who joins with open eyes becomes a party to all that he sees.

■ The appellant also renews the contention, rejected by this court on the first appeal, that the indictment under the membership clause states no punishable offense because of the provisions of § 4(f) of the Internal Security Act of 1950, 64 Stat. 987, 50 U.S.C.A. § 783(f). In § 2 of this Act, 50 U.S.C.A. § 781, Congress embodied the finding that the Communist movement in the United States is a rigidly and ruthlessly disciplined organization which seeks the overthrow of the Government of the United States by force and violence, and hence presents a clear and present danger to the exist-ence of the United States and of free American institutions which requires the enactment of legislation designed to prevent the accomplishment of this purpose. Accordingly, § 4(a) of the statute, 50 U.S.C.A. § 783(a), makes it a crime for any person knowingly to combine or conspire with any other person to perform any act which would substantially contribute to the establishment of a totalitarian dictatorship in the United States under the domination of any foreign government, organization or individual; and § 4(c) of the Act makes it unlawful for any agent of a foreign government, or any officer or member of the Communist organization, knowingly to obtain or receive from any officer of the United States any information which shall have been classified by the President as affecting the security of the United States. Sections 7 and 8 of the Act, 50 U.S.C.A. §§ 786, 787, provide for compulsory registration of Communist organizations and the members thereof with the Attorney General under a criminal penalty for failure prescribed by § 15 of the Act, 50 U.S.C.A. § 794. The registration statements are required to contain the name and address of each individual who is an officer or member of the organization and in case the organization fails to register, it becomes the duty of any individual who is a member thereof to register with the Attorney General.

The legislative history of this statute shows that while it was under consideration Congress became aware that the registration provisions might be held unconstitutional as compelling self-incrimination under § 4(a) of the Act making it a crime to conspire to establish a Communist organization in the United States and also as compelling self-incrimination under the membership clause of the Smith Act.[3] On this account the bill was amended by the enactment of § 4(f) of the statute, 50 U.S.C.A. § 783(f), which provides that "neither the holding of office nor mem-

---

3. S.Rep. No. 1385, 81st Cong. 2nd Sess., pp. 43–44; Cong.Rec. 13739, 13740; H.

Rep. No. 3112, 81st Cong. 2nd Sess., 96 Cong.Rec. 15280.

bership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute."

It is obvious that the provisions of the Internal Security Act which are aimed at membership in a Communist organization relate to the same subject as the membership clause of the Smith Act. Bearing this in mind, the defendant contends that the declaration in § 4(f) of the Internal Security Act that membership in a Communist organization by any person shall not constitute per se a violation of subsection (a) of the statute, or a violation of any other criminal statute, effectively nullifies the membership clause of the Smith Act and bars a prosecution of the present case. It is said that the membership clause of the Smith Act must have been in the mind of Congress since there is no other criminal statute to which the last phrase of § 4(f) could apply and, therefore, there is no ground for the prosecution of one whose only offense is membership in such an organization.

■■ This contention was carefully considered in the opinion of Judge Parker on the first appeal in this case at 227 F.2d 589, where it was pointed out that the exemption from criminal prosecution under § 4(f) is limited to membership per se and does not exempt from prosecution members of the Communist Party who hold membership in the organization with guilty knowledge of its criminal purpose to bring about the violent overthrow of the Government. This becomes the more clear in the pending appeal by reason of the contention of the defendant based on the holding of the Supreme Court in the Dennis and Yates cases that mere membership in a Communist organization unaccompanied by advocacy and teaching of concrete action for the forcible overthrow of the Government is not a punishable offense within the membership clause. With these considerations in mind the meaning of the provision of § 4(f) that membership in a Communist organization shall not con-

stitute per se a violation of the Internal Security Act or any other criminal statute becomes obvious. Indeed, it is now settled that a statute forbidding mere membership in a Communist organization would violate the First Amendment. Section 4(f) of the Internal Security Act does not bar the present prosecution.

■ It is hardly worthwhile to discuss the contention of the defendant that the jury was unable to reach an independent and impartial verdict on the evidence because of the finding of Congress in § 2 of the Internal Security Act that the Communist Party was an organization which seeks to overthrow the Government of the United States by force and violence. Every criminal statute is an expression of opinion by Congress that certain conduct is meretricious and should be punished criminally. Such a statute is the Smith Act, and it would be difficult to find a juror who does not know that it was aimed primarily at the Communist organization. See United States v. Lightfoot, 7 Cir., 228 F.2d 861, 870.

The defendant also contends that the membership clause, *as applied to the facts of this case,* is unconstitutional under the First, Fifth and Sixth Amendments. It is asserted that the evidence was not restricted, as it should have been, to the proof of concrete action by the Communist Party and the defendant for the purpose of overthrowing the Government, but was allowed to range over a wide field so as to include activities in the form of free speech and free assembly protected by the First Amendment. It is also said that the defendant was not "informed of the nature and cause of the accusation" as required by the Sixth Amendment because the jury were instructed that the charge of membership in the indictment could be sustained only by proof that the defendant was an *active* member of the Party, so that a new element was introduced in the accusation which is not mentioned in the statute and is so vague that it presents no ascertainable standard of guilt; and hence the information clause of the Sixth

Amendment and the due process clause of the Fifth Amendment were both violated.

■ We need not stop to give extended consideration to the last contention, for it is obvious that the defendant was not prejudiced by the instruction that in order to convict the jury must find that he was not only a member but an active member of the Party. This instruction was completely in harmony with the view expressed by the Supreme Court that the Smith Act contemplates not merely the advocacy of a theory of government but the advocacy of a concrete action of an unlawful character.

■ The other contentions obviously relate to the relevancy and sufficiency of the evidence to support the verdict and may be best considered after a statement of the evidence is set forth. It is well, however, to point out preliminarily that special duties with respect to the evidence are imposed upon the trial judge in a case of this kind. He must determine not only whether the evidence offered is relevant and is sufficient to prove the allegations of the indictment, as in the ordinary case, but he must also determine whether the facts proved constitute such a clear and present danger to the state as to overcome the prohibitions of the constitutional amendments and justify a conviction under the statute. In other words, the judge must decide, as a question of law, whether it is proper from a constitutional standpoint to apply the statute to the situation disclosed by the testimony. This was the position taken by the trial judge in the Dennis case, and it was approved not only in the illuminating discussion by Judge Learned Hand at 183 F.2d 201, 215, 216, but also in the opinion of Chief Justice Vinson in the following words (341 U.S. at pages 513, 514, 515, 71 S.Ct. at page 869):

"When facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law. The doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial rule to be applied as a matter of law by the courts. The guilt is established by proof of facts. Whether the First Amendment protects the activity which constitutes the violation of the statute must depend upon a judicial determination of the scope of the First Amendment applied to the circumstances of the case.

\* \* \* \* \* \*

"The question in this case is whether the statute which the legislature has enacted may be constitutionally applied. In other words, the Court must examine judicially the application of the statute to the particular situation, to ascertain if the Constitution prohibits the conviction. We hold that the statute may be applied where there is a 'clear and present danger' of the substantive evil which the legislature had the right to prevent. Bearing, as it does, the marks of a 'question of law,' the issue is properly one for the judge to decide."

### The Evidence

With these considerations in mind we now summarize the evidence that was adduced in the district court to support the allegations of the indictment: (1) that the Communist Party of the United States was at all times from 1946 until the finding of the indictment, a society which taught and advocated the overthrow of the United States by force and violence as speedily as circumstances would permit; and (2) that the defendant during this period was a member of the Party, well knowing its purposes and intending to effectuate them. The evidence relates to both categories and that which relates to the second not only shows the personal participation and activities of the defendant but supplements the general evidence as to the character and purposes of the Party.

Five ex-Communists gave testimony as to the character of the Party, two of whom, John Lautner and Barbara Hartle,

were bona fide members and three, William Garfield Cummings, Obadiah Jones and Bellarmino J. Duran, became members in order to secure information for the Federal Bureau of Investigation.

Lautner was born in Hungary in 1902 but was brought to America at the age of sixteen months and lived in Youngstown, Ohio, until he was six, when he was taken back to Hungary. He there had a public school education and one and a half years at a teachers' college. He returned to Youngstown at the age of eighteen and became a naturalized citizen of the United States in 1926. He was a member and a full-time employee of the Communist Party from 1929 to 1950, excepting the period of his military service between November 1942 and May 1945. In 1950 he was accused of being a Government agent and was expelled from the Party. At that time he was a leading member of the Party, having been chairman of the New York State Review Commission since 1947 and a member of the National Review Commission, the Party's top security board, since 1948. Since he had been a loyal member of the Party he was deeply disturbed by his expulsion and got in touch with the Federal Bureau of Investigation and volunteered to cooperate with the objectives of that organization in its investigation of the Party's activities. Since his expulsion he has testified as a Government witness in seventeen Smith Act cases and in numerous hearings before different Federal boards and departments, and during this period he received $125 a week plus travel expenses.

When he joined the Party in 1939 he became a student with twenty others from different parts of the country at a national training school sponsored by the Party's Hungarian National Bureau and carried on in the City of New York. He attended another training school in 1941 with six other students, all of whom were high Party officials, and from 1931 to 1945 he was himself a teacher at various Party schools in Canada as well as in New York and Cleveland.

During the period from 1930 to 1931 he was taught, and in turn taught his own classes, that the ultimate aim of the Party was to bring about a fundamental change in the economic, social and political structure of capitalism in the United States and that this change could not be achieved peaceably but could and would come as a result of force and violence in wresting power from the capitalist class in this country. Later, in 1947 and 1948, he taught Marxism-Leninism at the functionary school classes in New York, teaching substantially the same doctrine as that above described. The purpose of the course was to explain the application of the "classic" theories of Marx, Engels, Lenin and Stalin to the present day. These writings taught revolutionary principles of action, which included the acceptance of reforms obtained by legal means in order to use them as a screen for violent activities of a revolutionary character.

In July 1945, the National Convention held in New York reconstituted the Party. It was chiefly concerned with putting an end to the "revisionist" policies of Earl Browder, formerly General Secretary of the Party, which aimed at a peaceful rather than a revolutionary road to Communism in this country. In order to effectuate the change, the Party leaders conducted classes for students of various grades, which included the use of an outline of nine "lessons" each covering a specific phase of Marxism-Leninism with reference to the Communist classics. These outlines contained passages which specifically called for the use of force in overthrowing the governments of capitalist nations and taught that the liberation of the oppressed classes was impossible without violent revolution and destruction of the apparatus of state power.

When Lautner was appointed Chairman of the New York State Review Commission as a successor to J. Peters, he acquired a key job in Communist Party security. His duties included cleansing the Party of deviationist tendencies. No dissent and no deviation was allowed.

At the National Convention in 1948 he acted as security chief, seeing to it that not only the press but other curious outsiders were excluded and that the whereabouts of every delegate was known at all times. After the convention he was assigned the job of lining up a series of hiding places and communication points for the New York organization's underground system and finding trustworthy members in whose custody sums of money up to $20,000 could be deposited.

On cross-examination it was brought out that in 1930 Lautner married a young woman, at the direction of the Party, in order to enable her to become a naturalized citizen. She was a stranger to him at the time and he never saw her again after the ceremony. Subsequently, acting on the Party's instructions, he secured a divorce and remarried, but in 1941 he got an annulment based on the false statement that he was a practicing Catholic and the further statement that his second wife had falsely represented that she would embrace the Catholic faith.

Mrs. Hartle was born in 1908 in Evans, Washington. She was graduated from Washington State College and later engaged in various occupations including work on a magazine, department store advertising and the operation of a lending library and gift shop. She became interested in the writings of Karl Marx in 1931 and joined the Socialist Party in Spokane. There she came in contact with Communists who were recruiting Party members amongst the Socialists. She was persuaded by them to join a Communist-front organization called the Friends of the Soviet Union. By 1934 she held a Communist Party membership. She became secretary of a unit of ten members, was indoctrinated in the principles of Marxism-Leninism and was given various assignments in propaganda activities and the distribution of Communist educational material. She attended a Communist school in Seattle and in 1937 became the manager of a Communist book store which circulated Communist literature including pamphlets and newspapers. She attended a "Stalin" school in Seattle at the expense of the Party and studied various Marxist and Stalinist texts. From then on she became more and more interested and more and more prominent in the Party and was given various positions of responsibility. She was a full-time Party worker from 1940 until 1952 and held numerous offices, including membership on both the District Board and the District Committee of the Northwest District, an area which included Washington, Oregon and Idaho. In 1945 she succeeded to the number two job in the District, that of Organizational Secretary.

Mrs. Hartle played an important part in the activities of the Party in 1945, when a marked stiffening of Party doctrine took place. She was a delegate from the Northwest District to the emergency National Convention held in New York City in July of that year. Immediately prior to the convention a letter written by Jacques Duclos, the French Communist chief, was published in this country first in the New York World-Telegram and later in various Party publications. It became the subject of anxious discussion in Party circles and the principles which it espoused were adopted. The substance of the letter was that, under the leadership of Earl Browder, the Communist Party of the United States had revised and departed from the doctrines of Marxism and Leninism and had given up the class struggle and the dictatorship of the proletariat as necessary to the achievement of the aims of Communism. A resolution to this effect was offered by the Resolutions Committee, of which Mrs. Hartle was a member, and was passed by the Convention. It was concluded that the Party should not pursue the peaceful road to Marxist socialism but the revolutionary road to upset the capitalist system in the interest of the working class.

In April 1946, Mrs. Hartle was assigned by the Northwest District to attend the National Training School at a summer resort near New York City. She attended its sessions for a period of two

months with thirty other students, all of whom were officers and functionaries of the Party. The school was under the direction of one Jacob Mindel. It was part of a re-education program the purpose of which was to train theoreticians and propagandists and to dispose of and to destroy the last remnant of "revisionism" of the Browder era. Emphasis was placed on the struggle between the capitalist and wor'·ing class and the duty of the Communist Party to foment the class struggle by revolutionary tactics. The general aim was said to be a proletarian revolution to accomplish the dictatorship of the proletariat. The students were taught that a spontaneous struggle of the working class would never succeed and that in order for Marxist socialism to succeed a seizure and retention of power through a dictatorship was essential. It was taught that the United States was the foremost imperialist country in the world and was at the stage for proletarian revolution. The students were told that the members of the Communist Party must go amongst the workers and the masses and gain leadership of them by participating in their struggle. During these studies the classic texts of Marx, Engels, Lenin and other leaders were used. The students were told that the United States was a "bourgeois state" and "must be forcibly overthrown by the working class led by the Communist Party," and that the Communist Party must prepare the working classes for this seizure of power. Two examples of the revolutionary seizure of the state by force and violence were given; i. e., the Paris Commune, which was described as the first attempt of the proletariat to storm the citadel of capitalism, which failed because the proletariat did not take sufficient steps to retain the power, and the 1917 Bolshevik Revolution in Russia. Mindel explained that imperialist wars could "only be ended by the civil war of the workers against their own government," with the Communist Party in the lead.

Mrs. Hartle herself used the instructions she received at this school when she later taught in the Party's training schools in the Northwest District between the years 1946 to 1950. In summarizing what she taught between 1945 and 1950, before she went underground, she said that the Party goal was the dictatorship of the proletariat which could only be obtained by forcible means and that force and violence would be used to seize control when the conditions were ripe for this event.

In 1950, Mrs. Hartle disappeared into the Party's underground apparatus at the direction of her superiors. For a little over two years she lived under an assumed name and moved frequently from one place to another in Washington and Oregon. The purpose of the underground was to conceal the identity of Party members in positions of importance so that in case leaders of the Party were arrested for violating the Smith Act or for other reasons the Party would not lack trained personnel ready and able to carry on. Mrs. Hartle welcomed the change from the strenuous work she had previously performed but began to question the importance of the work and to lose interest in effectuating the Party purposes. This marked the beginning of her break with the Party, but before this actually took place she was arrested by the FBI in September 1952, and in 1953 was indicted, tried and convicted for violating the Smith Act. She was sentenced to five years imprisonment and ordered to pay a fine of $1000. She was released on bail pending appeal. During the trial she was notified by the Party that she was to be expelled for failing to follow Party discipline and for refusing to attend certain underground meetings. She agreed, however, to stand by the Party during the trial, and did so. On April 12, 1954, however, she made contact with the FBI and subsequently withdrew her appeal and was imprisoned for twenty and a half months until she was paroled on February 1, 1956. During her incarceration and subsequently, she testified before Congressional committees and for the Government in certain investigations into Communist activities

and in criminal prosecutions brought under the Smith Act.

In line with this testimony was the evidence of William Garfield Cummings of Toledo, Ohio, who joined the Party at the request of the FBI in February 1944. He testified that in December 1945 he attended the Party's Mid-West Regional School at Chicago and was taught by George Siskind, the principal instructor, that the capitalist system must be overthrown and that this could be done only by force and violence. He was also taught that the United States was in the last "imperialistic" stage of capitalism and that the only solution for the working class was the overthrow of the Government by force and violence, just as was done in the Bolshevik Revolution in Russia.

Obadiah Jones of St. Louis, Missouri, a Baptist minister and elevator operator, gave evidence as to the operation of a Communist Party training school which he attended in that city in 1947. The school was conducted under the guidance of George Siskind, the principal teacher, and Ralph Shaw, the chairman of the Party in Missouri. The students were furnished with books containing the teachings of Marx, Lenin and Stalin and were taught that the only way that the Negro problem of the "Negro nation" in the Black Belt in this country could be solved was by a proletarian revolution led by the Communist Party whereby capitalism would be wiped out by violence and bloodshed. The students pledged themselves to work for the Party and to carry out the instructions of its leaders even though it meant to fight and to kill. Jones made reports of his connection with the school and the Party to the FBI and testified for the United States in Communist investigations and prosecutions.

Bellarmino Duran, a resident of Denver, Colorado, who was brought up in a household where Spanish was spoken, was educated in grade schools in Wyoming, Idaho and Colorado. In March 1951, he attended a special school in Los Angeles, California, which was established by the National Education Committee of the Communist Party of the United States and was known as the National School for Mexican Cadres. At that time he was a member of the Communist Party of the State of Colorado and was furnishing information to the FBI. The persons in charge of the school were Art Berry, District Organizer of the Party for the districts of Montana, Idaho, Colorado, Utah, New Mexico, Arizona and Texas; and Alberto Moreau from the Jefferson School in New York City. All of the students in the school spoke Spanish. At the beginning teaching was in this language and later English was used. Berry explained to the students that the school was established to enable Mexican cadres to study the theories of Marx and Lenin in relation to the liberation of the Negro, Puerto Rican and Mexican people of southwest United States. Moreau spoke in an introductory talk about the monopoly of capitalism which had progressed into imperialism and the necessity of teaching the masses that the system must be changed and that this could only be done through a proletarian revolution in which the workers in industry and agriculture would participate and in which the speaker visualized himself as carrying a gun against the capitalists. The students were taught that the proletarian revolution could not be brought about in a peaceful way but could only be accomplished by force and violence through which the state machinery of the bourgeoise, including the courts and the military establishments, would be smashed. He explained that the Communist Party would be the vanguard of the movement and after it was successful and the Party was in control the guns would be collected from the people so that they in turn might be controlled.

Duran was a member of the Party from 1948 until April 1955, when he was expelled upon the charge that he had taught force and violence in violation of the Constitution of the Communist Party. At that time he was asked to sign a note containing the false statement

that the Communists did not teach the violent overthrow of the Government, but he refused to do so.

During his connection with the Communist Party he received compensation from the FBI for his services and subsequently testified in criminal prosecutions under the Smith Act and in other investigations on behalf of the Government.

### Evidence As To Scales

Ralph C. Clontz, Jr. testified at length in regard to the activities of the defendant Scales, of which he had first-hand knowledge from personal association. He also testified as to the activities and teachings of the Communist Party in general. He was the son of a Presbyterian minister and a resident of Charlotte, North Carolina. He was educated in the local schools and graduated from Davidson College in 1947, and from the Duke University Law School in 1950. After having completed three and a half years at Davidson, he enlisted in the army in 1942. When he was discharged in 1946 he held the rank of lieutenant and worked for military intelligence in Salzburg, Austria. In 1948, having become aware of Communist activity in North and South Carolina and fearing imminent war with Russia, he offered his services to military intelligence. They sent him to the FBI and he arranged with that organization to attempt to penetrate the Communist Party and find out what was going on. The FBI accepted his proposition but warned him that he would serve without compensation, and that if he got into trouble the Government would not recognize him and come to his aid.[4]

Thereupon, on September 9, 1948, he wrote to the defendant Scales telling him that he was a law student and was interested in Communism. Very shortly thereafter Scales sent him a large box filled with Communist literature and a letter inviting him to call at Scales' residence in Carrboro, North Carolina. Clontz called and had dinner with Scales and his wife. After dinner a discussion about Communism took place in which one McGirt, another Communist who came in later, participated. Scales explained that he had received a lot of

---

4. Clontz was not paid anything by the FBI for his activities during the year 1948 but paid all of his expenses, including travel, out of his own pocket. He was at that time enrolled at the Duke University Law School, but held full-time employment as the Division Sales Manager for Carolina Motor Club with upwards of twenty field representatives, i. e., salesmen, working under him. In 1949, his activity in the Party and at the law school made it necessary to cut down his salesmen to three. Around July 1949 he began to receive reimbursement from the Government for out-of-pocket expenses such as gasoline and the cost of Communist literature and other expenses necessary to carry on his investigation. In 1948 he had received $24.95 for services and expenses. At the end of 1949 he started receiving $20.00 a month from the Government. He was then married and had one child. The first of 1950 this monthly compensation was increased to $40.00 in addition to expenses; and when the Party sent him to the Jefferson School in New York in the summer of 1950 the Government paid him the equivalent of a first lieutenant's pay for the three-weeks period. When he returned to North Carolina his monthly payment was increased to $60.00 and remained at that until he went on full-time duty as a Government agent in January 1951. Thereafter he received a net sum of $450.00 a month plus expenses. He had, in the meantime, opened a law office, but he took a "cover job" in New York as a fraudulent claims inspector with the Association of Casualty and Surety Companies while he was acting as special agent for the Government. He received $300.00 a month from the Association but turned this over to the Government. He worked for the Association during the day and as a special agent for the Government at night, at least four nights a week. Other than his wife, no one knew of his Government connection. The salary of $450.00 lasted until February 3, 1953, when he quit Government service and commenced the full-time private practice of law. His association with the Government cost him money—his expenses in New York were $100.00 a month more than he received from the Government with the result that his savings of $2500 were wiped out.

Communist literature from the Party headquarters in New York. A later visit took place shortly before Christmas and at this time Clontz expressed the view that he had learned from his reading that Communism was a wonderful system and if the Party would educate people, they would vote the Communist Party into control of the Government. In a vigorous and extended reply, Scales said that this was completely impossible since the Government controlled all of the media of communication and education, as well as the Army, and that Communist success could only be accomplished by a militant force like that which had brought about the Bolshevik revolution in Russia. Scales furnished Clontz with the works of Stalin, in which it was said that the Bolshevik Revolution could serve as a model of tactics in any country and that the oppressed classes could not be liberated without a violent revolution and the destruction of the state. The revolutionary strategy was based on the idea that the revolution could be accomplished by bringing two classes together in common cause: first, the working class or proletariat and second, the "Negro nation" located in the thirteen Southern States. This was the repeated statement of Scales on various occasions in 1949 and 1950. At one time he said that the situation in the United States was closely analagous to the situation in Russia at the time of the Bolshevik Revolution when the Communists were in the minority in the month of July but were nevertheless victorious in seizing control of the government in the following October. Scales did not expect a revolution in the United States very soon but thought that if a depression came there would be a bloody revolution.

In December 1949, Scales suggested that Clontz become a member of the Party and Clontz agreed that Scales submit his application to the Party leaders. Around about this time Clontz was given several pieces of literature, including an outline entitled "Thirty Years of the Communist Party U.S.A.," a copy of the Constitution of the Party, a Study Course of the Communist Party, the Working Class and Industrial Concentration. The first part of 1950 Scales informed Clontz that certain Communists at the university at Chapel Hill had formed a Karl Marx Study Club and later certain representatives of the Party from New York gave lectures to the club at the university. At these lectures it was stated that the Communists believed that a revolution of the kind that had taken place in the Soviet Union was a certainty and a necessity and that things were moving fast and the revolution would certainly come before long.

Clontz became a member-at-large of the Communist Party on or about January 17, 1950. He was not given any card but was given a receipt for $1.50 for initiation and the first month's dues. Thereafter Scales gave Clontz private tutoring to prepare him for work in the Party. When asked when the revolution would come, Scales expressed the view that it would not come very soon but would come in time and that his fourteen month old daughter would marry a Communist in the United States. He felt that if a depression was imminent, it would greatly accelerate the coming of the revolution. During this period Clontz met Bernard Friedland, District Organizer for the Communist Party in the Carolinas, who questioned him about his background and his beliefs. Scales furnished Clontz with a number of Communist books for study in March 1950, including the "Foundations of Leninism," the "Problems of Leninism" by Stalin, and other works. In these works were a number of passages in which it was clearly stated that it was absurd to think that the revolution could be carried out peaceably without violence. It was said that the Soviet Union would not send troops to America to help in the revolution but would furnish experienced revolutionaries as instructors and supervisors.

In June 1950, Clontz told Scales that he would like to attend the summer session of the Communist school in New York called "The Jefferson School of

Social Science." Accordingly, Scales arranged for Clontz's admission and saw to it that he was provided with a scholarship to cover his expenses. In August 1950, during the three-week course, Clontz received special instructions from one Doxey Wilkerson, an instructor of the school and a member of the Party's National Committee. Wilkerson instructed Clontz that while some Party members had hoped that the Communists could gain power by peaceful means, it was necessary to "forget all this drivel," and that there was no longer any pretense that the Communists could win by the people's vote and that a violent revolution was necessary, which would come about by combining the forces of the "Negro nation" and the working class within the Communist Party. Clontz was also instructed that the Party in the South had been partly underground for a long time and that plans were being made for operation on an individual basis in secret communications from New York to the rest of the country. Clontz was instructed to remain under cover when he returned to North Carolina and maintain contact with an undercover Communist club. As part of the concealment process, an official statement had been issued by the Education Commission of the Party disowning or disclaiming certain study outlines, texts and publications. This was done to establish a technicality for Communists on trial and their attorneys to make conviction more difficult. It would not, however, hamper the Party because the instructors could fill in orally the revolutionary part.

During the period in which Clontz was being instructed in the doctrines of the Communist Party the defendant Scales was engaged in similar activity with Government witnesses Otis R. Readis and Charles Benson Childs. Readis was a native of North Carolina employed by the Western Electric Company at Winston-Salem. Childs was a resident of High Point, North Carolina, a student at High Point College (1948–1950), an employee of the Western Electric Company at Win-

ston-Salem (1951), and later a student at the University of North Carolina. Scales arranged for each of these men to attend Communist schools. He sent Readis to the Jefferson School in New York and Childs to a Party school for outstanding Party members from the Virginia and Carolina District which was held on a farm near Winston-Salem. Scales himself was the director of this school. In both of these schools the students were instructed in the principles of the Communist Party.

It was brought out in the testimony of these North Carolina witnesses that Scales occupied an important position in the Party as the chairman of the North and South Carolina District and as such reported regularly to the National Committee on the activities of the Party in his district, and saw to it that the directives of the National Committee were carried out in that area. These included the recruiting of members into the Party and the selection of promising Party members for further education in Communist doctrines. In December 1951, according to the testimony, he disappeared into the Communist underground. The evidence showed that he was completely familiar with the "Marx-Lenin classics" and that as a leader of the Communist Party he believed in and advocated the violent overthrow of the Government at the earliest feasible opportunity.

The evidence offered on behalf of the appellant Scales is stated as follows in the brief filed on his behalf in this court:

"The appellant did not testify. For the defense, ten witnesses were called, nine of whom knew Scales during the period that he was a member of the Communist Party, and testified in support of his character and conduct. These included two clergymen, a radio station employee, a professor at the University of North Carolina, a Greensboro businessman, a textile mill worker, the wife of a Superior Court judge, and the appellant's mother and aunt. None of them had heard the appellant advocate force and violence, and

**36**

several of them testified to Scales' statements and attitudes, heard by and known to them, which were inconsistent or incompatible with any such advocacy."

From the testimony of members of his family it was learned that Scales was born in Greensboro, North Carolina, in 1920. After finishing his secondary education in local schools he was an undergraduate student at the University of North Carolina and held various jobs in Greensboro and High Point, North Carolina. In June 1941 he was married and in December of that year, shortly after the Japanese attacked Pearl Harbor, he enlisted in the Army Air Force. He attended the Officers Candidate School but was dropped before securing a commission. He went overseas in 1945 and was discharged in February 1946. He returned to the University of North Carolina and was graduated in February 1946, after which he undertook certain graduate work in history. In the autumn of that year he made a public announcement of his membership in the Communist Party.

█ Taking this evidence in the light most favorable to the prosecution, which must be done if the historic function of the jury is to be recognized, it is fair to say that, contrary to the appellant's contentions, the allegations of the indictment have been sustained. There is indeed no substantial conflict in the evidence since the only testimony of the defendant's bearing on the merits of the case, i.e., the testimony of certain of his neighbors that they never heard him advocate force and violence, does not preclude the finding that he really believed in the tenets of Communism and advocated them in dealing with actual or prospective Party members. Nor does this evidence on his behalf contradict in any way the description of the Communist Party and its activities given by the witnesses for the United States.

It was clearly shown that the Communist Party "is of sufficient size and cohesiveness, is sufficiently oriented towards action, and other circumstances are such as reasonably to justify apprehension that action will occur." (Yates v. U. S., 354 U.S. at page 321, 77 S.Ct. at page 1078). It is organized and staffed on a national scale with territorial divisions presided over and directed by district leaders. It is constantly engaged in the infiltration of the working classes and in recruiting members in various parts of the country. It holds annual conventions, attended by representative leaders from the various districts and policed for security reasons to limit the attendance to loyal members, which determines the policies to be pursued and the methods to be employed by Party members. It maintains an underground apparatus in which important Party members in danger of arrest or interference disappear under assumed names in order that the Party may not lack leadership in times of emergency. It masks its purposes by false statements when it deems it expedient to do so.

█ It maintains training schools for officials and for novitiates in various parts of the country, in this case there is specific reference in the testimony to schools in New York, Canada, Seattle, Chicago, St. Louis and Los Angeles; and it distributes literature to members and prospective members. The true character and aim of the organization is shown by the teaching provided at these schools, as to which there is abundant uncontradicted testimony. At all of them, without exception, the students are taught that the United States is in the grip of a capitalistic society which oppresses and exploits the workers, and that this grip cannot be broken by peaceful and democratic means but only by the destruction of the institutions of the state by force and violence in a revolution of the workers led by the Communist Party in the vanguard. This doctrine is not held up to the students as a bare theory but as a basis for concrete action which must and will be taken whenever in the future a favorable opportunity presents itself. This doctrine was reaffirmed by the action taken by the Party at its National Convention in 1945 when the peaceful

policies advocated by Earl Browder were condemned and repudiated and the recommendations of Duclos, the leader of French Communism, were endorsed. On these facts the jury was entirely justified in reaching the conclusion that the elaborate structure of the Communist Party was set up for unlawful revolutionary concrete action accompanied by force and violence rather than for the mere advocacy of a theory of government.

The evidence in regard to Scales himself not only reinforces the conclusion as to the character of the Communist Party but justifies his conviction of charges contained in the indictment. We do not know what influences led him to become a member of the Party, for neither the United States nor the defendant offered any evidence on this point, but we do know that he was a prominent and active member of the organization, who served as chairman of the Carolina District of the Party and was active in recruiting suitable Party members amongst the university students in North Carolina, and that he furnished them with Communist literature and advised and instructed as to the Party doctrines and arranged for their attendance at established Communist schools where formal classes of instruction were given. He himself was a director of one of these schools and in harmony with their course of instruction, as above described. He himself in his contacts with new members consistently and repeatedly preached the revolutionary doctrine that, in the interest of the proletariat, the institutions of the state must be destroyed by force and violence as soon as it was reasonably possible to do so. He was constantly in touch with the national leaders of the organization and obeyed their instruction that he should go underground under an assumed name.

 We reach the conclusion of law, as did the trial judge, that the evidence in regard to the activities of the Communist Party and of Scales constituted proof of advocacy of concrete action, as distinguished from the promulgation of a theory, which created a clear and present danger of substantive evil beyond the protections of the First Amendment and within the right and power of Congress to prohibit. In our opinion, this conclusion is in accord with the approval given in Yates v. United States, 354 U.S. at pages 321, 323–324, 77 S.Ct. at page 1078, to the essence of the Dennis holding in these words:

"* * * Although the jury's verdict, interpreted in light of the trial court's instructions, did not justify the conclusion that the defendants' advocacy was directed at, or created any danger of, immediate overthrow, it did establish that the advocacy was aimed at building up a seditious group and maintaining it in readiness for action at a propitious time. In such circumstances, said Chief Justice Vinson, the Government need not hold its hand 'until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required.' 341 U.S., at page 509, 71 S.Ct. at page 867.

\* \* \* \* \* \*

"* * * Bearing in mind that Dennis, like all other Smith Act conspiracy cases thus far, including this one, involved advocacy which had already taken place, and not advocacy still to occur, it is clear that in context the phrase just quoted referred to more than the basic agreement to advocate. 'The mere fact that (during the indictment period) petitioners' activities did not result in an attempt to overthrow the Government by force and violence is of course no answer to the fact that there was a group that was *ready to make the attempt*. The formation by petitioners of such a highly organized conspiracy, with rigidly dis-

ciplined members subject to call when the leaders, these petitioners, felt that the time had come *for action*, coupled with * * * world conditions, * * * disposes of the contention that a conspiracy to advocate, as distinguished from the advocacy itself, cannot be constitutionally restrained, because it comprises only the preparation. It is the existence of the conspiracy which creates the danger. * * * If the ingredients of the reaction are present, we cannot bind the Government *to wait until the catalyst is* added.' 341 U.S. at pages 510–511, 71 S.Ct. at page 868 (emphasis supplied)."

We find nothing at variance with these conclusions in the recent decisions of the Supreme Court in Nowak v. United States, 356 U.S. 660, 78 S.Ct. 955, 2 L.Ed. 2d 1048; and Maisenberg v. United States, 356 U.S. 670, 78 L.Ed. 960, 2 L. Ed.2d 1056. See United States v. Silverman, 2 Cir., 248 F.2d 671.

### Admissibility of Evidence

█ It is contended that the judge erred in the admission of irrelevant evidence of an inflammatory character describing the activities of the Communist Party so that the defendant as a member of the Party was prejudiced in the eyes of the jury. Three documents relating to the Korean War are singled out, which were published by the Communist Party or under its auspices. They were a publication entitled "Pre-Convention Discussion Bulletin" issued by the Communist Party of the United States; a copy of the Moscow newspaper "Trud"; and a pamphlet entitled "I Saw the Truth in Korea" by Allen Winnington, a correspondent of the *Daily Worker* in Peking. They were given to Clontz by Scales in 1950 and 1951, the first two in Washington, D. C. and the third in Durham, North Carolina. They accused the United States of launching and waging a criminal, reactionary, imperialistic war in Korea to enslave the North Korean people and deprive them of their independence. The last mentioned document described a small area in the Rangwuel Valley near Taejon, where it was said that the bodies of 7000 political prisoners were found in shallow graves who had been massacred under American supervision and in accordance with American instructions.

Motion for mistrial on the ground that the publications were calculated to inflame the passions of the jury was denied. The judge, however, cautioned the jury that they should weigh the evidence objectively and should not allow themselves to be excited or inflamed so as to impair their ability to try the case impartially as between the Government and the defendant.

In addition, the defendant complains of the admission in evidence of Communist activities relating to the existence of a Black Belt in southern United States where the Negro population was oppressed and denied the right of self-determination; and the general contention is also made that the judge should not have admitted evidence of Communist doctrines and aims entirely distinct from Scales' knowledge of them.

In our opinion the evidence was properly received. That part to which the attack is chiefly directed consisted of documents handed by Scales to Clontz which were clearly intended to blacken the United States and stir up animosity against it and thus weaken its ability to defend itself should a revolution be attempted. It clearly served to corroborate the testimony in regard to Scales' activities in securing Party members and promoting the general objectives of the Party.

█ That part of the evidence which pertained to the activities of the Party with which he had no immediate connection was relevant, since it tended to prove the allegations of the indictment that the Communist Party of the United States was a group of persons who taught and advocated the overthrow of the Government of the United States by force and violence. That Scales had knowledge of

these objectives is shown by direct testimony as to his own teachings and activities on the Party's behalf. In respect to this contention, we said in denying the former appeal, 227 F.2d at page 589:

" * * * We think that this complaint is entirely without merit. The evidence as to the teachings carried on by the party and the documents used in the teachings was clearly competent to show the aims and purposes of the party; that which related to infiltration, subversion and the arousing of dissension had a direct bearing on the purpose to overthrow the government by force and violence when a favorable opportunity should present itself; * * *."

### Charge of The Court

The case was fairly submitted to the jury by the judge's charge. The jury were told that in order to convict the defendant they must find that the Communist Party teaches or advocates the overthrow of the Government of the United States by force and violence as speedily as circumstances will permit; that the defendant was a member of this Party who well knew of its teachings and purposes and that the defendant himself specifically intended to bring about such overthrow.

The jury were warned, however, that it is not criminal to hold or express the belief that the Government of the United States should be completely changed or to have such a change of government as a purpose or aim, or to express the opinion that the Government will at some time be overthrown by force and violence and that it is not criminal to criticize the Government and its policies, whether you agree or not with the truth or falsity of the criticism.

The jury were further told that it could not convict the defendant merely because he was a member of the Party no matter what its purposes and teachings are; and that teaching in the abstract what is meant by the aim to overthrow the Government by force and violence is not criminal, and that without

being criminal the Communist Party could try to persuade its members to espouse the belief that the Government should be overthrown by force and violence as speedily as circumstances permit, since this is no more than advocating an idea; but that if the Party went further and with the intent to overthrow the Government by force and violence advocated a principle of action which called on its members to take forcible and concrete action at some propitious time to overthrow the Government by force and violence, and pressed that call in such a way as to incite its members to take concrete and forcible action for such overthrow, such activities were forbidden by the Smith Act; but those to whom the advocacy is addressed must be urged to do something now or in the future rather than merely to believe in something.

Summarizing this portion of the charge the Court said:

"It is not the abstract doctrine of overthrowing or destroying organized government by unlawful means which is denounced by the Smith Act, but rather the teaching and advocacy of action for the accomplishment of that purpose, by language reasonably and ordinarily calculated to incite persons to such action. Accordingly, you cannot find that the Communist Party of the United States was a society or group of persons who teach or advocate the overthrow or destruction of the Government of the United States by force and violence, unless you are satisfied beyond a reasonable doubt that the Party did in fact so teach and advocate, and did so with the intent that such teaching or advocacy be of a rule or principle of action, and by language reasonably and ordinarily calculated to incite persons to such action, all with intent to cause the overthrow or destruction of the Government of the United States by force or violence as speedily as circumstances would permit."

Finally, the jury were told that although the defendant admitted that he was a member of the Party it was not sufficient that he be simply a member. It must be more than a nominal, passive, inactive or purely technical membership, and that in determining whether he was an active or inactive member the jury must consider how much of his time and effort he devoted to the Party; "to be active he must have devoted all or a substantial part of his time and efforts to the Party;" and that a specific intent on the part of the accused to bring about the overthrow of the Government as speedily as circumstances would permit was a necessary and indispensable requisite of the offense.

### The Jencks Statute

The defendant also contends that he was denied a fair trial because he was not permitted to inspect the entire reports and statements made to the Federal Bureau of Investigation before the trial by Government witnesses with respect to the subject matter of their subsequent testimony. During the trial the defendant called for the production of these reports and statements so that he might inspect them. They were accordingly produced but they were first delivered to the District Judge *in camera,* who excised therefrom such portions as do not relate to the subject matter of the testimony, and then turned them over to the defendant's attorney for his use. The defendant contends that this procedure did not conform with that laid down by the Supreme Court in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. That case involved the conviction of the president of a labor union for false swearing in an affidavit, filed pursuant to § 9(h) of the National Labor Relations Act, 29 U.S.C.A. § 159 (h), that he was not a member of the Communist Party. The principal witnesses for the Government were two Party members in the pay of the FBI, who testified concerning the Party activities of the defendant. On cross-examination they testified that during the course of their investigation they made reports to the FBI concerning the defendant's activities. Thereupon the defendant's attorney moved the Court to produce these reports for inspection and use in cross-examination. The judge denied the motion and his action was affirmed on appeal (5 Cir., 226 F.2d 540, 553) on the ground that no preliminary foundation was laid showing inconsistency between the contents of the reports and the testimony of the witnesses.

The Supreme Court reversed, holding that the defendant was not required to lay such a foundation because a sufficient foundation was established by the testimony of the witnesses that their reports related to the events and activities covered by their testimony. The Court said that to require the accused first to show conflict between the reports and the testimony would be to deny the accused evidence relative and material to his defense, since in the absence of an admission of conflict he would be helpless to know or discover conflict without inspecting the reports; and hence a requirement of showing conflict would be incompatible with our standards for the administration of criminal justice in the United States. The Court further held that relevancy and materiality for the purposes of production and inspection with a view to use on cross-examination are established when the reports are shown to relate to the testimony of the witness. The Court condemned the practice of producing government documents to the trial judge for his determination of relevancy and materiality without hearing the accused and held that the defense must be entitled initially to see the reports to determine what use may be made of them; only thereafter may the trial judge determine the admissibility of the reports and the method to be employed for the elimination of immaterial or irrelevant parts. Conceding that the protection of vital national interests may militate against public disclosure of documents in the Government's possession, the Court held that in a criminal action the choice lies with the Government and if it elects not to comply with

an order to produce relevant statements of reports of witnesses in its possession touching the subject matter of their testimony, the criminal action must be dismissed.[5]

The procedure prescribed in the Jencks case had not been generally recognized or followed in the Federal courts, nor had the practice been uniform. One accepted procedure required a showing of inconsistency between the pre-trial reports and the testimony of the witness as a basis for the production of the report. The Fifth Circuit, in its decision in the Jencks case, 226 F.2d 540, 552, and its earlier decision in Shelton v. United States, 5 Cir., 205 F.2d 814, 815, found encouragement for this course in the decision of the Supreme Court in Gordon v. United States, 344 U.S. 414, 418-419, 73 S.Ct. 369, 97 L.Ed. 447, 806, as did the First Circuit in its decision in Scanlon v. United States, 223 F.2d 382, 385-386. A different procedure was approved in the Second Circuit in the opinion of Judge Learned Hand in United States v. Krulewitch, 145 F.2d 76, 78-79, 156 A.L.R. 337. This practice did not compel the defense to lay a preliminary foundation of inconsistency but required the delivery of the reports to the judge, if requested by the defendant, as soon as it appeared that they had been made

by the witness and related to the subject matter of his testimony. It then became the duty of the judge to examine the statements *in camera* and if he should find something in them contradictory to the testimony of the witness, they were then delivered to the defendant for such use as he might desire.[6] It will be observed that in both of these procedures a showing of inconsistency had to be made, but the latter practice was the more helpful to the defendant since it relieved him of the difficulty of showing inconsistency in the reports before they were produced for examination.

The Jencks decision gave rise to much discussion in legal circles [7] and very quickly led to the passage of the Act of Congress of September 2, 1957, 71 Stat. 595, whereby Chapter 223 of 18 U.S.C., entitled "Witnesses and Evidence," was amended by adding a new section 3500. The purpose of this statute, as shown by the Legislative History set out in 2 U.S. Code, Congressional and Administrative News, 85th Congress, First Session, 1957, page 1861 et seq., was to provide an exclusive procedure for handling demands for the production of statements and reports of witnesses in court so as to preserve the rights of defendants and at the same time to protect confidential information in the pos-

**5.** The Court said, 353 U.S. 668, 77 S.Ct. 1013, 1 L.Ed.2d 1103:

"* * * We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F.B.I., touching the events and activities as to which they testified at the trial. We hold, further, that the petitioner is entitled to inspect the reports to decide whether to use them in his defense. Because only the defense is adequately equipped to determine the effective use for purpose of discrediting the Government's witness and thereby furthering the accused's defense, the defense must initially be entitled to see them to determine what use may be made of them. Justice requires no less.

"The practice of producing government documents to the trial judge for his determination of relevancy and materiality, without hearing the accused, is disap-

proved. Relevancy and materiality for the purposes of production and inspection, with a view to use on cross-examination, are established when the reports are shown to relate to the testimony of the witness. Only after inspection of the reports by the accused, must the trial judge determine admissibility—e. g., evidentiary questions of inconsistency, materiality and relevancy—of the contents and the method to be employed for the the elimination of parts immaterial or irrelevant. See Gordon v. United States, 344 U.S. at page 418, 73 S.Ct. at page 372."

**6.** See also United States v. Cohen, 2 Cir., 145 F.2d 82, 92; United States v. Ebeling, 2 Cir., 146 F.2d 254, 256; United States v. Lebron, 2 Cir., 222 F.2d 531; Boehm v. United States, 8 Cir., 123 F.2d 791, 807-808.

**7.** 46 Georgetown L.J. 180, note; 67 Yale L.J. 674.

session of the Government. An additional purpose was to correct what seemed to Congress to be a widespread misinterpretation and popular misunderstanding of the opinion in the Jencks case, as shown by decisions referred to in the Legislative History, pages 1864–1868, which had led to the unnecessary disclosure of irrelevant government reports and interfered with the prosecution of criminal cases by the United States.

The new Act [8] provides in substance that no statement or report in the possession of the United States which was made by a Government witness to an agent of the Government shall be the subject of discovery or inspection until the witness has testified on direct examination in the trial of the case; and that after he has testified the court, on motion of the defendant, shall order the United States to produce any statement of the witness in its possession which relates to the subject matter of his testimony. If the United States claims that any such statement contains matter which does not relate to the subject matter of the testimony, the court is required to order the United States to deliver the statement for the inspection

8. 18 U.S.C. § 3500.

"§ 3500. Demands for production of statements and reports of witnesses

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement. Added Pub.L. 85–269, Sept. 2, 1957, 71 Stat. 595."

of the court *in camera,* and thereupon the court is required to excise the irrelevant portions and to deliver the balance of the statement to the defendant for his use. If in such case the defendant is convicted, the entire text of the statement must be preserved by the United States and, in the event of an appeal, must be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. If the United States elects not to comply with an order of the court to deliver any such statement to the defendant, the court is required to strike the testimony of the witness from the record and proceed with the trial, unless the court in its discretion determines that the interest of justice requires that a mistrial be declared.

The second trial of the pending case, now before us on appeal, took place after this statute was passed and the judge complied with its provisions when the defendant demanded the production of the reports of the Government witnesses for his inspection. The Government delivered the entire reports to the judge with the request that certain portions indicated therein should be excised by the judge *in camera* on the ground that they did not relate to the testimony of the witnesses. The judge complied with this request, examining all the reports and excising such portions as in his opinion did not relate to the testimony, and thereupon delivered the balance of the reports to the defendant. The defendant concedes that the judge complied with the statute but contends that the Act is unconstitutional since it did not fully comply with the requirements of due process laid down in the Jencks decision.

■■■ Through some misunderstanding as to the defendant's wishes the original unexcised reports of the Government witnesses were not sent to this court with the record on appeal but at the defendant's request the Government has now made them available to this court, as required by the statute, and they are now in our possession. We have examined them to determine the correctness of the rulings of the trial judge and we concur in his finding that the excised portions of the reports did not relate to the subject matter of the testimony of the witnesses. It remains to pass on the contention of the defendant that the new Act is unconstitutional.

■■■ In our opinion the Jencks decision does not require this conclusion and we hold the Act to be valid. It must be borne in mind in the first place that the position of the Government in the pending case is not the same as it was in Jencks, so that the Supreme Court has not yet passed on the specific question now before this court. In Jencks the Government objected to the production of any part of the reports on the ground that inconsistency with the testimony had not been shown, and the court sustained the objection. It was this ruling that the Supreme Court passed upon, holding that the entire reports should be produced for the inspection of the defendant's attorney so that he might offer the whole or such parts of them in evidence as he thought wise, whereupon it would become the duty of the trial judge to decide whether the reports should be admitted or certain parts thereof eliminated as immaterial or irrelevant. In other words, the Court did not pass upon the question, which arises under subsection (c) of the new statute, of what is to be done when the United States claims that a particular statement ordered to be produced contains some matter which does not relate to the subject matter of the testimony. In any event, it is our opinion that this statutory provision, whether it be regarded as an addition to or a change in the Jencks procedure does not amount to a denial of the due process required by the Fifth Amendment but is merely a procedural regulation which preserves certain substantial rights of the accused and at the same time protects the Government files from the danger of unnecessary disclosure of its sources of information.

Most significant is the fact that the new statutory procedure does not deny the defendant access to any information

which would be helpful to his case. Production of the reports for inspection does not depend upon the permission of Government custodians or the attorneys for the prosecution; and the determination of what portions of the reports should be excised is not left to the Government but is entrusted to the impartial and experienced judgment not only of the trial judge but also the judges of the appellate courts and the Justices of the Supreme Court themselves, if in their discretion they determine to review the case. The standard set by Jencks, 353 U.S. at page 669, 77 S.Ct. at page 1014, that justice requires no less than that the defense be entitled to see the reports to determine what use may be made of them is satisfied; and justice requires no more.

The defense is denied only the opportunity to be heard on the question whether the excised portions of the reports bear on the testimony of the witnesses; and this does not amount to a denial of due process. It does not interfere with any constitutional right to which the defendant is entitled but merely restricts his examination of the Government files which he desires to make, not because he has any reason to believe that they will yield anything helpful to his case but on the chance, which costs him nothing, that something will be turned up that will weaken the prosecution. In this situation it is clearly within the province of Congress to protect the right of the United States to withhold facts which it has gathered and to shield the sources of its information in the public interest so long as no pertinent information is withheld from the defendant. This can be done only by entrusting the determination of relevancy to someone other than the parties to the cause, and the method devised by Congress is obviously fair both to the Government and to the defendant and represents a reasonable exercise of Congressional power. In the Jencks decision the Supreme Court was not dealing with constitutional questions. It was exercising what is described in McNabb v. United States, 318 U.S. 332, 340, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819, as its supervisory authority over the administration of criminal justice in the United States by establishing and maintaining civilized standards of procedure and evidence; and Congress, by the passage of the interstitial legislation contained in § 3500 was merely exercising its concurrent power in the same field to provide for a case that the Court did not envisage.

The conclusion that the provisions of the new statute were not violative of the constitutional rights of the defendant is supported by the decision of the Second Circuit in United States v. Gandia, 255 F.2d 454, where it was held that the defendants were not entitled to have their convictions vacated under 28 U.S.C. § 2255 merely because the trial judge, having inspected the reports made by a Government witness and finding them not to be inconsistent with the witnesses testimony, denied the defense access to them. The court said that in the Jencks case the Supreme Court did not hold that constitutional considerations entitled defendants access to witnesses' reports but announced only an evidentiary rule to be followed in the trial of criminal cases in the United States courts. See also United States v. Angelet, 2 Cir., 255 F. 2d 383; United States v. Spangelet, 2 Cir., 258 F.2d 338; United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077; United States v. Consolidated Launderies Corp., D.C. S.D.N.Y., 159 F.Supp. 860.

## Impaneling of Grand Jury

Finally, the defendant makes the contention that the indictment is invalid because the grand jury was illegally impaneled. The method of selecting jurors was that the Deputy Clerk of the District Court and the Jury Commissioner sent out a number of form letters to reputable citizens requesting them to furnish a list of persons available for jury duty. The letters were sent, amongst others, to superintendents of public schools, bank

presidents, sheriffs, and the chairmen of the Republican and Democratic Parties in the counties in the district. In response the court officials received a list of names and addresses from which they eliminated those persons whom they deemed unfit on the basis of personal knowledge and those who appeared from the inspection of the list to be unsuitable. For example, those listed as physicians were stricken. The names were then placed in the jury box and when the time came to select the jury for a term of court the names of fifty-six persons were drawn at random from the box and summoned for jury service. The reverse side of the summons contained a questionnaire covering the qualifications of the jurors and when the returns came in they were checked to ascertain whether the persons summoned were qualified under the jury statute. 28 U.S.C. § 1861. When the prospective jurors appeared in answer to the summons, the names of fifty-six qualified persons were put in a hat from which nineteen were drawn by lot and they became the grand jury, the rest forming the petit jury panel. The jurors were then questioned by the judge as to their payment of taxes for the previous two years and any litigation pending before the court, and whether they had any reason to be excused. A grand jury selected in this manner found the indictment on which the pending case was tried.

It does not appear from the evidence that any qualified person or class of persons was excluded from jury service or that any disqualified person served on the grand jury chosen in this case or that the defendant was in any way prejudiced by the procedure. It is, nevertheless, contended that the grand jury was illegally impaneled, since the panel did not consist of persons whose names were "publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing." It is said that the jury officials did not comply with the statute because they did not make sufficient investigation of the persons on the list before their names were put in the box and hence the prosecution must fail even though the defendant was not prejudiced, since the injury in such case affects the jury system and the community at large. See Ballard v. United States, 329 U.S. 187, 195, 67 S.Ct. 261, 91 L.Ed. 181; Dow v. Carnegie-Illinois Steel Corp., 3 Cir., 224 F.2d 414; United States v. Dennis, 2 Cir., 183 F.2d 201; Walker v. United States, 8 Cir., 93 F.2d 383; Dunn v. United States, 6 Cir., 238 F.2d 908; United States v. Silverman, D.C.D.Conn., 129 F.Supp. 496. A motion to dismiss the indictment on this ground was filed but it was denied by the judge who held that the selection of the grand jury did not involve any substantial deviation from the requirements of the statute and that in any event the defect had been waived by the failure of the defendant to raise the point within a reasonable time.

 We think that the motion to dismiss was properly denied. It clearly appears that the defendant not only suffered no prejudice but that he waived the point by failing to comply with the provisions of Rule 12 of the Federal Rules of Criminal Procedure, 18 U.S.C. Subsection (b) (2) of the rule provides that defenses and objections based on defects in the institution of the prosecution or in the indictment may be raised only on motion before trial and that the motion shall include all such defenses and objections then available to the defendant and that the failure so to act constitutes a waiver thereof, although the court, for cause shown, may grant relief from waiver. The rule further provides that the motion shall be made before the plea is entered but the court may permit it to be made within a reasonable time thereafter. The defendant did not comply with the provisions of this rule, as is shown by the following recital of facts.

He was indicted on November 18 and arraigned on December 7, 1954. At that time he declined court appointed counsel,

secured a reduction in bail and a delay of the arraignment for one week to enable him to secure counsel of his own choosing. This period was subsequently extended to December 16. By that time the defendant had not secured an attorney and the court appointed counsel for the purposes of arraignment only. The defendant pleaded "not guilty," but notified the court that he reserved the right to make certain pre-trial motions, and the court granted a further delay until January 14, 1955. The defendant expressed complete satisfaction with the counsel who represented him on December 16.

On January 14, the defendant appeared with a New York attorney and requested an additional sixty days for the filing of motions and secured an order of the court permitting him to file such motions by February 18, with the right of the Government to reply on March 2, and a hearing of the motions on March 8. These dates were satisfactory to the defendant's attorney. On February 18, eight motions were filed but none of them attacked the grand jury. The hearing took place on March 8, at which the defendant was represented by a Washington attorney. By order of March 14 these motions were denied.

Subsequently, on March 15, the defendant filed the motion attacking the grand jury now under consideration. Evidence as to the method of selecting the jury was taken, a hearing was had and on April 15, as we have seen, the motion was denied. This ruling was entirely justified under the terms of Rule 12, as interpreted by the authorities. The information on which the motion was based was at all times available to the defendant and yet he failed to take action despite liberal extensions of time. See United States v. Silverman, D.C., 129 F.Supp. 496, 513; Nations v. United States, 8 Cir., 52 F.2d 97, 99; Agnew v. United States, 165 U.S. 36, 44, 17 S.Ct. 235, 41 L.Ed. 624; United States ex rel. McCann v. Thompson, 2 Cir., 144 F.2d 604, 156 A.L.R. 240; Wright v. United States, 8 Cir., 165 F.2d

405; Notes of Advisory Committee, fol. Rule 12, F.R.Crim.Proc., 18 U.S.C.A.

Accordingly, the judgment of the District Court is

Affirmed.