**In the Matter of Maurice Louis BRAVERMAN.**

**Misc. No. 32.**

United States District Court, D. Maryland.

June 3, 1975.

Stanley Mazaroff, and C. Christopher Brown, of Baltimore, Md., for Maurice Louis Braverman.

*Recommendations of the Panel to the Full Court*

Maurice Braverman, who was disbarred from practice in our court in 1957, seeks reinstatement as a member of its bar. His application was referred

---

to this panel for hearing and for recommendation to the full court.

In 1952 Braverman and five codefendants were found guilty by a jury in this court of conspiracy to violate the provisions of Section 2 of the Smith Act, 18 U.S.C.A. § 2385.[1] Judge Chesnut, who presided at the trial, sentenced Braverman to imprisonment for three years and a fine of $1,000. On appeal, the convictions were affirmed. *Frankfeld et al. v. United States*, 198 F.2d 679 (4 Cir. 1952), cert. den. 344 U.S. 922, 73 S.Ct. 389, 97 L.Ed. 710 (1953), reh. den. 345 U.S. 913, 73 S.Ct. 652, 97 L.Ed. 1348 (1953). After his release from prison Braverman was disbarred by the Court of Appeals of Maryland and by this court. *Braverman v. Bar Association of Baltimore City*, 209 Md. 328, 121 A.2d 473 (1955), cert. den. 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51 (1956); *In re Braverman*, 148 F.Supp. 56 (D.Md. 1957). Recently, on application, Braverman was readmitted to practice law in Maryland. *In re Braverman*, 271 Md. 196, 316 A.2d 246 (1974).[2]

In support of his present application Braverman makes several arguments, which should be considered separately and in relation to each other.

1.

Braverman argues that he never engaged in or incited force and violence.[3] This argument misconceives the offense with which Braverman was charged and of which he was convicted. He was not charged with engaging in or inciting force or violence.

Essentially, the charge was that he had knowingly and wilfully become a member of and participated in a conspiracy, the purpose of which was to teach and advocate the duty and necessity of overthrowing the Government of the United States by force and violence as speedily as circumstances would permit. See n. 1, above. The opinion of the Fourth Circuit, written by Chief Judge Parker, set out and discussed the evidence which that court found sufficient to support the charge, 198 F.2d at 684–687. That opinion dealt first with the evidence that during the relevant period the Communist Party of the United States had as its objective the overthrow of the government of the United States by force and violence as speedily as circumstances would permit. Id. at 684–686. The opinion then stated:

"The connection of the defendants with the conspiracy in which the Com-

1. The indictment charged defendants with conspiracy to violate the statute "by (1) unlawfully, willfully, and knowingly advocating and teaching the duty and necessity of overthrowing the Government of the United States by force and violence, with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit; and by (2) unlawfully, willfully, and knowingly organizing, and helping to organize, as the Communist Party of the United States of America a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence, with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit." The allegations describing the conspiracy in greater detail are set out in *Frankfeld v. United States*, 198 F.2d 679,

at 681, 682. Section 2 of the Smith Act is set out in that opinion at p. 681.

2. At the hearing on the pending application this panel has considered not only the opinions cited above, but also the transcript of the trial in this court in 1952, the transcript of the hearing before Judges Grady, Ross and Arabian in connection with Braverman's application for readmission to the Maryland Bar, the letters from members of the bar and other citizens with respect to Braverman's recent activities, recommending the granting of his application for reinstatement, the answers of Braverman to questions put to him by members of our panel, and the arguments presented by Braverman and his counsel at the hearing before us.

3. He refers to a comment by Judge Chesnut during the trial that there was no evidence "that you had been given to force and violence". (Tr. 2137).

munist Party was engaged was also amply supported by the testimony. The case as to them was not one of mere membership in the party depending upon 'guilt by association'. They were shown to be officers and teachers of the party occupying such positions with respect to its activities that the jury could well conclude that they necessarily had knowledge of the criminal purposes in which it was engaged. * * *" Id. at 686.

After discussing the participation of the other defendants, the opinion continued:

"* * * Defendant Braverman had served as a member of the District Committee of the party, had been a candidate for chairman at one of its meetings, had served as its attorney, was a member of its 'white collar club' and had conducted classes for it in his home. By reason of the positions held by these persons in the party and the active part taken by them in its work, the jury were amply justified in concluding that they had knowledge of its purposes. It is well settled that persons who join a conspiracy with knowledge of its unlawful purposes make themselves parties thereto and are equally guilty with those who originated it. [citations omitted] As said by Mr. Justice Jackson in American Communications Association v. Douds, 339 U.S. 382, 433, 70 S.Ct. 674, 701, 94 L.Ed. 925, '* * * personal guilt may be incurred by joining a conspiracy. That act of association makes one responsible for the acts of others committed in pursuance of the association'." Id. at 686, 687.

Judge Parker then discussed the fairness of the trial, and stated:

"Defendants contend that the court submitted the case in such way as to permit the jury to convict them of conspirary on the basis of mere membership in the Communist party, without knowledge on their part of any criminal purpose in which the party was engaged. There is no basis for any such contention. On the contrary the jury were expressly instructed that no one of the defendants could be convicted unless the jury should find guilty knowledge and intent on his part. * * *" Id. at 687.

This conclusion was supported by quotations from the charge. Id. at 687, 688.

Braverman did not take the stand at his trial and does not deny that he participated in various activities of the Communist Party, as referred to in the opinion of the Fourth Circuit, and that he conducted classes in his home, teaching the Communist classics.[4]

Asked by a member of our panel whether Lenin did not advocate the use of force and violence, Braverman answered that he had followed very carefully the discussion of the works of Marx and Lenin in the *Schneiderman* case before he joined the Communist Party; that he had read some but not all of their works, and that he "never came across force and violence as a way

---

4. Braverman has suggested that he was convicted because of his work as attorney for the party and for some of its members. Judge Chesnut made clear, however, that such legal services did not constitute adherence to the conspiracy (Tr. 2560); rather, as Judge Parker noted, they were admissible to show that he had knowledge of the purposes of the party. 198 F.2d at 686.

On cross-examination by counsel for one of the defendants, Mrs. Markward, one of the government witnesses, testified as follows:

"Q (By Mr. Wright [attorney for defendant Wood]): Now, I want to know if there was ever advocated the use of force and vio- lence by the Communist Party, and if you can do it, please tell us about that, when it was, under what circumstances it was done, if you can. Give us the dates, if you recall them, to the best of your recollection.

"A Well, this was something which was constantly reiterated over the years, and I heard it stated and agreed to by all of the defendants at some time. I can't tell you at which meeting, the date of such meeting, I can't tell you that at this time, but it is in the record. The statement was that it was necessary to bring about the revolution, and the statement was also that this could not come about peacefully." (Tr. 1475–1476).

of achieving a change". In a published speech which Braverman made at the Law School of the University of Maryland after he was readmitted to the Maryland bar, which was called to his attention during the hearing before our panel, Braverman said: "And, as a matter of fact, it was because I was assured by the Supreme Court in the Schneiderman case that the Communist Party did not believe in force and violence that I joined the Communist Party".

Aside from the inherent incredibility of the quoted statements made by Braverman, the opinions in the *Schneiderman* case clearly refute those statements. *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), was a proceeding to cancel a certificate of citizenship, granted in 1927. The Court held that the evidence did not show with the requisite degree of certainty that, during the period in question, Schneiderman was not attached to the principles of the Constitution of the United States. Importantly, however, for the point our panel is now considering, the opinion of Mr. Justice Murphy referred to: The Communist Manifesto of Marx and Engels; The State and Revolution by Lenin; The Statutes, Theses and Conditions of Admission to the Communist International; and The Theory and Practice of Leninism, written by Stalin. 320 U.S. at 149–151, 63 S.Ct. 1333. Each reference was accompanied by a footnote, setting out quotations from the work. Excerpts from The Communist Manifesto included:

"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. * * *

"In depicting the most general phases of the development of the proletariat, we traced the more or less veiled civil war, raging within existing society, up to the point where that war breaks out into open revolution, and where the violent overthrow of the bourgeoisie lays the foundation for the sway of the proletariat." Id. at 149, 63 S.Ct. at 1348.

Excerpts from The State and Revolution, by Lenin, included:

"Fifth, in the same work of Engels, . . . there is also a disquisition on the nature of a violent revolution; and the historical appreciation of its role becomes, with Engels, a veritable panegyric of a revolution by force. * * *

" * * *

"The necessity of systematically fostering among the masses this and only this point of view about violent revolution lies at the root of the whole of Marx's and Engels' teaching * * *." Id. at 149, 150, 63 S.Ct. at 1348.

The material in footnotes 35 to 39 of Mr. Justice Murphy's opinion, id. at 149–152, 63 S.Ct. 1333, show repeated advocacy of force and violence, some of it after 1927.

The dissenting opinion of Chief Justice Stone, in which Mr. Justice Roberts and Mr. Justice Frankfurter concurred, id. at 170 et seq., 63 S.Ct. 1333, also showed the continuing advocacy of force and violence, and was supported by an appendix containing long quotations from the cited works, id. at 197 et seq., 63 S.Ct. 1333. One quotation from The State and Revolution, by Lenin, will suffice: "The substitution of a proletarian for the capitalist State is impossible without violent revolution. * * *" Id. at 204, 63 S.Ct. at 1374.

At the hearing before our panel, Braverman said: "I believed what I read (i. e. that belief in force and violence was incompatible with membership in the Communist Party), and when I found out there was a difference between what I read and what was carried out in practice, I severed my connection with the Communist Party * * *." In fact, he severed his connection after his release from prison. His active association with the party was during the period which saw, inter alia, the commu-

nist coup d'etat in Czechoslovakia, in 1948.

### 2.

Braverman argues that his "conviction, the thing for which I was convicted, conspiracy to teach and advocate, was a crime from the time of Dennis to the time of Yates",—that the Smith Act "was in essence ruled unconstitutionally applied, wrongfully applied, in cases similar to mine".

Certainly, the trial of Braverman et al. in this court and the affirmance of the conviction on appeal were controlled by the principles decided by the Supreme Court in *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). But it is not true, as Braverman argues, that later cases in the Supreme Court have held that the evidence found sufficient to convict Braverman and his codefendants would not still be sufficient to support a conviction.[5]

In *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the Court reaffirmed the basic principles decided in *Dennis*. The Court reversed the convictions in *Yates* because the trial judge had not charged the jury that in order to convict, the jury must find that the advocacy which the defendant conspired to promote was of a kind

calculated to "incite" persons to action, 354 U.S. at 316, 77 S.Ct. 1064. It should be noted that such a charge *was* given in *Dennis* and *was also* given by Judge Chesnut in Braverman's case.[6] The *Yates* opinion then considered the evidence presented against the several defendants; it found that with respect to five of the defendants the evidence was not sufficient to prove the requisite knowledge, but that as to nine of the defendants the evidence was sufficient, and as to them the Court remanded the case for a new trial. It should be noted that in *Scales v. United States*, 260 F.2d 21 (4 Cir. 1958), Judge Soper stated that in the *Yates* case "the Dennis decision was explained and approved". 260 F.2d at 24.

The *Scales* case, in which the decision of the Fourth Circuit, 260 F.2d 21, was affirmed by the Supreme Court, 367 U. S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), was a successful prosecution under the Smith Act.[7]

Dealing with the defendant's argument that the statute infringed First Amendment freedoms, Mr. Justice Harlan speaking for the Court, stated:

"  *  *  * It was settled in *Dennis* that the advocacy with which we are here concerned is not constitutionally protected speech, and it was further

5. It is quite possible that during the present efforts toward detente between the United States and the Soviet Union, no prosecution based on the evidence offered against Braverman would be brought. It does not follow that if such a prosecution were brought the evidence against Braverman would not be sufficient to support a conviction, in the light of the decisions of the Supreme Court since *Dennis*.

6. Judge Chesnut instructed the jury (Tr. 2255): "And in this connection I further instruct you that the Smith Act is not aimed against the teaching of the mere abstract doctrine of overthrowing the government or the mere teaching of the historical doctrine of Marxism or Leninism. The Communist Party and its members are entitled to do this so long as their teaching does not go to the extent of advocating action for the accomplishment of a violent revolution by language

reasonably and ordinarily calculated to incite persons to such action."

7. At issue in *Scales* was the validity of the membership clause of the Smith Act. The statutory challenge was grounded on an argument that Section 4(f) of the Internal Security Act of 1950, 50 U.S.C.A. § 783(f), constituted a *pro tanto* repeal of the membership clause of the Smith Act. This argument had been twice rejected by the Court of Appeals for the Fourth Circuit (227 F.2d 589, Parker, C. J.; 260 F.2d 27, Soper, J.) and was similarly rejected by the Supreme Court on the ground that Section 4(f) of the Internal Security Act merely prevented the finding of a *per se* violation from mere membership and by its terms should be construed as requiring not only knowing membership, but also active and purposive membership.

established that a combination to promote such advocacy, albeit under the aegis of what purports to be a political party, is not such association as is protected by the First Amendment. We can discern no reason why membership, when it constitutes a purposeful form of complicity in a group engaging in this same forbidden advocacy, should receive any greater degree of protection from the guarantees of that Amendment." 367 U.S. 228, 229, 81 S.Ct. at 1486.

Scales had also argued that the membership clause was invalid as against due process objections under the Fifth Amendment due to the lack of any substantial relationship between status as a member and the Party's claimed advocacy of violent overthrow. The Court disposed of that contention in these terms:

"In this instance it is an organization which engages in criminal activity, and we can perceive no reason why one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act." 367 U.S. at 226, 227, 81 S.Ct. at 1485.

After an extended review of the evidence, the Court stated:

"We conclude that this evidence sufficed to make a case for the jury on the issue of illegal Party advocacy.

*Dennis* and *Yates* have definitely laid at rest any doubt that present advocacy of *future* action for violent overthrow satisfies statutory and constitutional requirements equally with advocacy of immediate action to that end. 341 U.S. at page 509, 71 S.Ct. [857]; at page 867, 95 L.Ed. 1137; 354 U.S. at page 321, 77 S.Ct. [1064] at page 1078, 1 L.Ed.2d 1356. Hence this record cannot be considered deficient because it contains no evidence of advocacy for immediate overthrow." Id. at 251, 81 S.Ct. at 1497.[8]

3.

Braverman also argues that the crime of which he was convicted "was not a crime involving moral turpitude, but was rather a political crime".[9]

His first argument on this point may be summarized as follows: "Since there are constitutional authorities that say there is an absolute right to advocate overthrow of the government, can this be moral turpitude?"

It is true that some legal scholars and some dissenting opinions in the Supreme Court have espoused the view that the First Amendment right is absolute. But that view has not been adopted or applied by the Supreme Court or by the Fourth Circuit. As Chief Justice Vinson said in *Dennis:*

" * * * Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, for if a society cannot

8. The opinion continued:
"Since the evidence amply showed that Party leaders were continuously preaching during the indictment period the inevitability of eventual forcible overthrow, the first and basic question is a narrow one: whether the jury could permissibly infer that such preaching, in whole or in part, 'was aimed at building up a seditious group and maintaining it in readiness for action at a propitious time * * * the kind of indoctrination preparatory to action which was condemned in *Dennis*.' *Yates, supra,*

at 321–322, 77 S.Ct. 1064." 367 U.S. 251, 252, 81 S.Ct. at 1497.

9. In one sense the crime of which Braverman was convicted was a political crime, because it dealt with issues which are important to the polity of the United States. Judge Chesnut, however, took pains to be sure that hysteria or abuses which sometimes occur in such cases did not occur in the trial before him. Indeed, it was the defendants themselves, particularly Braverman, who sought to make a political trial out of the case.

protect its very structure from armed internal attack, it must follow that no subordinate value can be protected. . . .

"Obviously, the words cannot mean that before the Government may act, it must wait until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required." 341 U.S. 494, 509, 71 S.Ct. at 867.

After thus rejecting "any principle of governmental helplessness in the face of preparation for revolution", the Chief Justice turned to whether the means employed by Congress in the Smith Act conflict with the First and Fifth Amendments to the Constitution. Dealing with an argument by the defense that the Smith Act would prohibit academic discussion of the merits of Marxism-Leninism, he noted that the very language of the Act itself negates such an interpretation, since it is directed at advocacy, not discussion.

In considering the application of the Holmes-Brandeis "clear and present danger" test, the Chief Justice distinguished the case before the Court from those cases where the test resulted in reversal of convictions because the interest the State was attempting to protect was itself too insubstantial to warrant restriction of speech. In *Gitlow v. People of New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), which dealt with the New York criminal syndicalism statute, Justice Holmes and Justice Brandeis dissented because they felt dissemination by Gitlow of his Manifesto posed no substantial threat to the community. However, as Chief Justice Vinson pointed out, the two great dissenters were not confronted in *Gitlow* with any situation comparable to the one in *Dennis*— "the development of an apparatus de-

signed and dedicated to the overthrow of the Government, in the context of world crisis after crisis." 341 U.S. at 510, 71 S.Ct. at 867.

The crime of which Braverman was convicted does involve moral turpitude in the legal sense of the term, particularly in the case of a lawyer who has taken an oath to support the Constitution of the United States.

**4.**

Finally, Braverman argues that he has been rehabilitated; that since his release from prison he has not engaged in any illegal activities, but has earned his living as an accountant, and more recently has engaged in various legal or paralegal activities helping the poor and the unfortunate. He has submitted to us, as he did to the state courts, letters and statements from respected members of the bar and others attesting to his rehabilitation and supporting his application for reinstatement.

The word rehabilitation has several meanings. We have no doubt that Braverman has rehabilitated himself within some of those meanings, and that if he were still under probation supervision he should be released therefrom. The question here, however, is whether he should be admitted to argue cases before this court, in which an increasingly large percentage of the cases involve questions of constitutional law.

Not only was he convicted of a crime which involved a violation of his oath to support and defend the Constitution of the United States, he still argues that the evidence was insufficient to convict him despite the careful review of facts and law by Judge Chesnut and the Fourth Circuit.

His statement to us with respect to what was said in the opinion in the *Schneiderman* case was made either recklessly or with intent to mislead the panel.

We welcome the amount of rehabilitation which Braverman has achieved; we respect his efforts to help unfortu-

nate persons; but we conclude that he should not be readmitted to the bar of this Court.

\*

We, therefore, recommend to the court that Braverman's application for reinstatement as a member of the bar of this court be denied.

ROSZEL C. THOMSEN
Senior United States District Judge
HERBERT F. MURRAY
United States District Judge
C. STANLEY BLAIR
United States District Judge

## ORDER

The matter of the petition of Maurice Louis Braverman for reinstatement as a member of the bar of this court having been referred by the court to the disciplinary committee of the court as a panel of the court to receive any evidence and arguments offered in connection therewith, and to make a report to the full court;

The panel having considered the transcript of petitioner's original trial in 1952, the decision of the United States Court of Appeals affirming his conviction, the subsequent disbarment proceedings in this court and the Court of Appeals of Maryland, the transcript of petitioner's hearing before Judges Harold Grady, David Ross and Mary Arabian in connection with his application for readmission to the Maryland bar, the material submitted to those judges with respect to petitioner's recent activities, the report of said judges and the decision and opinion of the Court of Appeals of Maryland thereon;

The panel having held a hearing on the petition and having considered the statement made by petitioner at such hearing and his responses to questions put to him by members of the panel, and the arguments presented by counsel on his behalf;

The panel having submitted to the full court its recommendation that petitioner's application for reinstatement as a member of the bar of the court be denied;

The opinion of the panel in support of its recommendation having been fully considered,

It is this 3rd day of June, 1975, ordered that the application of Maurice Louis Braverman for reinstatement to the bar of the court be; and the same hereby is, *denied*.

EDWARD S. NORTHROP
Chief Judge
ROSZEL C. THOMSEN
Senior District Judge
R. DORSEY WATKINS
Senior District Judge
JAMES R. MILLER, Jr.
District Judge
HERBERT F. MURRAY
District Judge
C. STANLEY BLAIR
District Judge

The undersigned dissent from this order, and for the reasons set forth in the dissenting opinion believe that the application for reinstatement should be granted.

FRANK A. KAUFMAN
District Judge
ALEXANDER HARVEY, II
District Judge
JOSEPH H. YOUNG
District Judge

JAMES R. MILLER, Jr., District Judge (concurring).

I believe a short explanation of my views is warranted on the issues presented by this petition of Maurice L. Braverman for reinstatement to the Bar of this Court.

The opinion of the Disciplinary Committee [1] differs little from the dissenting opinion of Judge Kaufman. The major divergence between the views of

---

1. Local Rule 2A establishes the Disciplinary Committee as an arm of this Court in carrying out certain functions relating to the disbarment and reinstatement of practitioners. The present members of that committee are Judges Thomsen, Murray, and Blair.

the judges of this Court has centered about the question of whether Braverman has been rehabilitated, a *sine qua non* of reinstatement. This, in turn, has required a resolution of the question of whether Braverman has been truthful in his assertion in this Court and elsewhere that he was not aware in the 1940's and early 1950's that Communist doctrine preached the use of force and violence as an instrument of achieving a change in a system of government.

Judge Kaufman, while recognizing the validity of Braverman's conviction in 1951 and acknowledging that the crime of which he was convicted is one of moral turpitude, nevertheless would find Braverman to have been rehabilitated on the strength of the evidence of his activities since his release from prison, the testimonials offered in his behalf by respected members of the bench and bar and others, and the action of the Maryland Court of Appeals in reinstating him to the Maryland Bar. In his excellent opinion, Judge Kaufman has agreed with the majority that Braverman, in view of his statements to this Court, must convince the Court "that he honestly believes he never advocated violence in the context of which he was convicted."[2] But Judge Kaufman would resolve that issue by granting the benefit of any doubt on the matter to Braverman since, admittedly, "certainty . . . is probably seldom if ever entirely possible where the credibility and reliability of a human being is concerned."[3] It is on this point that I must respectfully disagree with Judge Kaufman.

In the first place, the Local Rules of this Court establish the Disciplinary Committee as the initial fact-finding arm of the Court in a proceeding for reinstatement.[4] The members of that committee had the opportunity to observe the petitioner during his testimony on the reinstatement motion and concluded that his statement with regard to "what was said in the opinion in the *Schneiderman* case was made either recklessly or with intent to mislead the panel."[5] The unanimous view of the three members of this Court, who were assigned to hear Braverman personally, as to the credibility of his statement weighs heavily with me.[6]

In the second place, I have listened to the tape of the proceeding which took place before the Disciplinary Committee and heard no reason to disregard the findings of the committee.

Thirdly, I believe that Judge Smith of the Maryland Court of Appeals was correct when he pointed out, in his dissent to the reinstatement of Braverman to the Bar of that Court, that disbarment is not imposed as a punishment, but as a necessary means of protection to society.[7] Accordingly, it seems to me that any substantial doubt as to the rehabilitation of the petitioner, particularly in view of the special significance in this Court of the required oath to support the Constitution of the United States, should be resolved in favor of the protection of society rather than in the interests of the individual petitioner.

Fourthly, I do not subscribe to the revisionist concept that the offense of which petitioner was convicted would

---

2. Judge Kaufman's dissenting slip opinion, p. 817.

3. *Id.*

4. Local Rule 2A reads in pertinent part reguarding a motion for reinstatement:

    "The Disciplinary Committee may direct that copies of the motion shall be sent to any person who filed the original charges leading to the suspension and other interested persons or organizations. Thereafter, the Disciplinary Committee may conduct such proceedings as it deems appropriate on

the motion and report its findings and recommendations to the judges of this court who shall then make a determination of the motion."

5. See pp. 803–805 and 807 of "Recommendations of the Panel to the Full Court."

6. *Cf. Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474 at 496, 71 S.Ct. 456, 95 L.Ed. 456.

7. *In Re Braverman*, 271 Md. at 218–219, 316 A.2d 246.

not now constitute a crime and that, therefore, he sould be reinstated to the Bar of this Court. It is by no means clear that the concepts of conspiracy to advocate and incite the overthrow of the government by force and violence and of freedom of speech are so changed today that the offense of which Braverman was convicted could not stand under present law. The Smith Act has not been declared invalid by the Supreme Court. As Judge Kaufman has pointed out, Judge Chesnut's instructions in Braverman's case clearly required, in order to convict, a finding by the jury of something more than mere abstract advocacy of a forceful overthrow of the government, and there was testimony in the trial that Braverman had himself advocated the use of force and violence. In any event, the fact remains that Braverman was convicted, that his conviction was upheld on appeal, and that no subsequent pardon or post-conviction proceedings have altered or rescinded the conviction.

I concur in the order of the Court denying the motion for reinstatement.

FRANK A. KAUFMAN, District Judge, with whom ALEXANDER HARVEY, II, and JOSEPH H. YOUNG, District Judges, join, dissenting:

Maurice Braverman was disbarred from practice in our Court in 1957. Herein he seeks reinstatement as a member of its bar. The history of Braverman's 1952 trial in, and conviction by, this Court for conspiracy to violate section 2 of the Smith Act, 18 U.S.C. § 2385, is fully reviewed in the opinion of the three-judge panel of this Court whose recommendation and decision are adopted today by those three Judges and three additional Judges of this Court. In preparing this dissenting opinion, there have been considered not only the opinions of the State Courts referred to in the majority opinion of this Court, but also the transcript of the trial in this Court in 1952; the transcript of the hearing before Judges J.

Harold Grady, David Ross and Mary Arabian in connection with Braverman's application for readmission to the Maryland bar; the letters from members of the bar and other citizens with respect to Braverman's recent activities, recommending the granting of his application for reinstatement; and the record of the proceedings before the three-judge hearing panel of this Court.

## I

Rule 2A(F) of the Local Rules of this Court provides, in relevant part:

(F) Except under *extraordinary circumstances,* an attorney who has been disbarred by this court shall not be eligible for readmission. An attorney who has been suspended and who desires to be readmitted to practice before this court shall file a motion setting forth facts showing good cause why readmission should be granted. The motion shall set forth facts showing that the movant is *rehabilitated* and is otherwise entitled to the relief sought. * * * [Emphasis supplied.]

In seeking readmission to the bar of this Court, Braverman has predicated his case upon the same grounds which led the Court of Appeals of Maryland to readmit him to practice law in the Courts of the State of Maryland. In so doing, Chief Judge Murphy wrote (271 Md. 196, at 198–200, 316 A.2d at 247 (1974)):

* * * On May 21, 1973, eighteen years after his original disbarment, Braverman filed a petition in this Court for reinstatement to practice law. He alleged that during the period following his disbarment, he establishe his trustworthiness, demonstrated his good moral character, and was now worthy of reinstatement to the Maryland Bar. In his affidavit accompanying the petition, Braverman recited that his association with the Communist Party ceased shortly after his release from prison in 1955; that he had established and conducted a

bookkeeping service catering to small business concerns in the Baltimore metropolitan area, an occupation he continues to this day; that he was active in the political mainstream of our country, seeking to influence the passage of legislation and the election of men and women to office who best represent his concerns; that for the past four years he served as Treasurer of the New Democratic Coalition, Fifth District Club; that he serves on the executive board of his community association; that he has become active in efforts to improve the criminal justice system, serving as President of the St. John's Council on Criminal Justice, Inc.; that at the invitation of the Attorney General of the United States, he had recently participated in the four-day National Conference on Criminal Justice in Washington, D. C.; and that for the last two years, he has been teaching courses on poverty and criminal justice in the Baltimore Free University held on the Johns Hopkins University campus. Numerous communications from citizens, including many lawyers, personally acquainted with Braverman's qualifications for readmission to the Maryland Bar were submitted in support of his petition for reinstatement.

On October 1, 1973, we ordered that Braverman's petition for reinstatement to practice law in this State be referred for an evidentiary hearing to a three-judge panel comprised of Judges J. Harold Grady and David Ross of the Eighth Judicial Circuit of Maryland and Judge Mary Arabian of the District Court of Maryland. *See In re Braverman,* 269 Md. 661, 309 A. 2d 468. We directed that Braverman, the Maryland State Bar Association and the Bar Association of Baltimore City, and other proper parties, be permitted at the hearing to offer relevant and material evidence, to cross-examine, and fully argue the merits of the petition for reinstatement to determine whether, in light of the princi-

ples articulated in *In re Meyerson,* 190 Md. 671, 59 A.2d 489 (1948) and *Maryland State Bar Association v. Boone,* 255 Md. 420, 258 A.2d 438 (1969), Braverman had in the period following the rendering of the judgment of removal, become rehabilitated and a proper person to be admitted to the bar, *viz.,* whether he could demonstrate "fitness acquired since unfitness was established by the disbarment." 190 Md. at 687, 59 A.2d [489] at 496. We directed that in making its recommendation to us, the three-judge panel should evaluate, in particular, these four factors:

1. The nature and circumstances of Braverman's original misconduct.

2. His subsequent conduct and reformation.

3. His present character.

4. His present qualifications and competence to practice law.

The evidentiary hearing was held before the three-judge panel on October 15, 1973. Braverman testified on his own behalf, as did a number of citizens, including lawyers, judges, educators, and state officials. Each gave testimony clearly tending to demonstrate that Braverman had rehabilitated himself in the period following his disbarment and had become a proper person to be admitted to the Bar of Maryland. No contrary testimony or evidence was adduced. The Maryland State Bar Association, acting through its Board of Governors, and after conducting its own investigation, unequivocally recommended that Braverman be readmitted to practice law in this State. The Bar Association of Baltimore City, acting through its President, told the three-judge panel that "there has not been a scintilla of evidence presented to the Executive Council of the Bar Association of anything derogatory about Mr. Braverman . . . [and it had no] information that is contradictory to what these individuals [those persons testifying and writing letters on

Braverman's behalf] state about his character and his honesty and his trustworthiness since his release from prison and during the period subsequent to his release."

The three-judge panel concluded that Braverman had established "by clear and convincing proof his fitness to practice law" and recommended that he be reinstated as a member of the Bar. * * *

The findings and holdings of the three-judge State Court panel, and the reasons and conclusions of the majority of the Court of Appeals of Maryland are set forth at length in Chief Judge Murphy's opinion. With equal clarity, force and vigor the dissenting views of Judge Smith, concurred in by Judge Barnes, are also so set forth. Judge Smith noted particularly that Judge Thomsen in the 1957 Braverman disbarment opinion filed on behalf of himself and Judge Watkins in the days when they, along with Judge Chesnut, then a Senior Judge, were the only Judges of this Court, had stressed:

> * * * Not only was the crime of which he was convicted a felony, it involved moral turpitude; and it involved a violation of the first undertaking of the oath which respondent took when he was admitted to practice as an attorney of this court: "I will support the Constitution of the United States".

*In re Braverman*, 148 F.Supp. 56, 57 (D.Md.1957). Judge Smith wrote (271 Md. *supra* at 231 at 263) that the jury in Braverman's trial before Judge Chesnut had concluded

> * * * that Braverman committed acts which violated his oaths of loyalty to the United States, oaths taken when he was admitted to the bars of

this Court and of the United States District Court for the District of Maryland. Therefore, by his acts he betrayed the trust and confidence reposed in him when he was originally admitted to practice in this Court. I am of the opinion that a person who demonstrates by his conduct that an oath means nothing to him, and who shows not the slightest repentance for his misbehavior, is not qualified to be an officer of this Court, as Braverman will be upon his reinstatement to the bar by the Court's action today. Therefore, I am strongly of the opinion that Braverman's petition should be rejected.

Thus, Judge Smith dissented from the majority's holding that Braverman had by "clear and convincing proof" (271 Md. *supra* at 210, 316 A.2d 246) demonstrated his right to reinstatement.

Under the standards set forth by its own Rule 2A(F), this Court may not readmit Braverman "[e]xcept under extraordinary circumstances". In applying essentially that test—a test which, as Chief Judge Murphy indicated, is generally recognized—the majority of the Court of Appeals of Maryland has readmitted Braverman. In *Re Isserman*, 345 U.S. 286, 73 S.Ct. 676, 97 L.Ed. 1013 (1953), the Supreme Court, in a four-to-four, equally-split decision, determined that the respondent had not shown good cause why he should not be disbarred from practicing before it. Isserman had previously been disbarred from practicing in the State of New Jersey by the highest Court of that State. In his opinion written on behalf of the four Justices whose positions determined the outcome of the case, Mr. Chief Justice Vinson, after reciting the Supreme Court's rule,[1] wrote (345 U.S. *supra* at 287–88, 73 S.Ct. at 677):

---

1. Rule 2 ¶ 5 which provided as follows:

Where it is shown to the court that any member of its bar has been disbarred from practice in any State, Territory, District, or Insular Possession, or has been guilty of conduct unbecoming a member of the bar of this court, he will be forthwith suspended from practice before this court, and unless, upon notice mailed to him at the address shown in the clerk's records and to the clerk of the highest court of the State, Territory, District or Insular Possession, to which he belongs, he shows good cause to the contrary within forty days he will be disbarred.

*This Court (as well as the federal courts in general) does not conduct independent examinations for admission to its bar.* To do so would be to duplicate needlessly the machinery established by the states whose function it has traditionally been to determine who shall stand to the bar. Rather our rules provide for eligibility in our bar of those admitted to practice for the past three years before the highest court of any state.[3] The obvious

[3]. Rule 2, ¶ 1:
"It shall be requisite to the admission of attorneys or counsellors to practice in this court, that they shall have been such for three years past in the highest court of a State, Territory, District, or Insular Possession, and that their private and professional characters shall appear to be good."

premise of the rule is the confidence which this Court has in the bars maintained by the states of the Union. Respondent himself came to our bar upon presenting a certificate of his admission to the bar of the highest court of New Jersey, which now no longer finds him qualified for its bar.

Disbarment by a state does not automatically disbar members of our bar, but this Court will, *in the absence of some grave reason to the contrary,* follow the finding of the state that the character requisite for membership in the bar is lacking, *Selling v. Radford,* 1917, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). But we do not follow the rule used in some state courts that disbarment in a sister state is followed as a matter of comity.[4]  [Emphasis supplied.]

[4]. [Omitted.]

Rule 2 of the Local Rules of this Court provides in part:

It shall be requisite for the admission of any person to practice in this Court that such person shall make written application and be sponsored by a member of the bar of this Court and shall satisfy the Court that he or

she is a member in good standing of the bar of any Court of the United States, or of the highest Court of any State, and that his or her private and professional character is good. He or she shall, before being admitted, take and subscribe in open court to the following oath, and pay the prescribed fee to the Clerk.

"In the presence of Almighty God, I do solemnly swear:

"I will support the Constitution of the United States. * * * "[2]

While there is no mandate that this Court admit or exclude from its bar an attorney simply because the highest Court of the State of Maryland so does, there is every reason, as *Isserman* teaches, why this Court should give the greatest of weight to the Maryland Court's action. That is true even in the absence of any known federal court precedent with regard to admission or readmission rather than disbarment—and thus is true in this case. In that context the question posed by Braverman's application for readmission must be considered herein.

**II**

Braverman has at all times maintained that he never engaged in, advocated, or incited governmental change by force and violence and that he never conspired with anyone so to do. At the same time Braverman has stated that he is in no way challenging the finality of his 1952 conviction in this Court. Nevertheless he continues to challenge, as he has from the day his 1952 trial was completed, the sufficiency of the evidence upon which he was then convicted. Thus, he does maintain his innocence of the crime of which he stands convicted. He also contends that under the Supreme Court opinions handed down since his conviction in this Court and the affirmance thereof on appeal, the evidence

[2]. The full oath set forth in Rule 2 is not set out above but the explicit sworn under-

taking therein to support the Constitution of the United States is hereby noted and stressed.

at his trial would not be deemed sufficient, as a matter of law, to permit his conviction.

Judge Chesnut's charge to the jury in Braverman's trial was letter-perfect under the principles set forth in *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), as Judge Parker made clear in the Fourth Circuit's affirmance. Some years after *Dennis,* in *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), a majority of the Supreme Court, speaking through Mr. Justice Harlan, held (354 U.S. *supra* at 324, 77 S.Ct. 1064) that the jury charge was not "adequate" because the District Court failed to make the necessary " * * * distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action * * * " (354 U.S. *supra* at 318, 77 S.Ct. at 1076). After determining that that inadequacy required the reversal of the convictions of the fourteen defendants, the Supreme Court examined the record to determine whether it "foreclose[d] further proceedings against those of the petitioners as to whom the evidence in this record would be palpably insufficient upon a new trial * * * " (at 328, 77 S.Ct. at 1081). After so doing, the Court held that as to nine of the fourteen, a new trial was justified, but as to the other five, "the sole evidence as to them was that they had long been members, officers or functionaries of the Communist Party of California" and that insofar as the record disclosed "none of them has engaged in or been associated with any but what appear to have been wholly lawsul activities"; and that "[m]oreover, apart from the inadequacy of the evidence to show, at best, more than the abstract advocacy and teaching of forcible overthrow by the Party, it is difficult to perceive how the requisite specific intent to accomplish such overthrow could be deemed proved by a showing of mere membership or the holding of office in the Communist Party." (at 330–31, 77 S.Ct. at 1083).

In *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782, *reh. denied,* 366 U.S. 978, 81 S.Ct. 1912, 6 L. Ed.2d 1267 (1961), Mr. Justice Harlan construed the applicable statute as excluding "mere membership" in the Communist Party as grounds for conviction and indicated that the statute, and underlying constitutional principles, required that (a) there be advocacy of "the violent overthrow of the Government, in the sense of present 'advocacy of action' to accomplish that end as soon as circumstances were propitious; and" that (b) the defendant be "an 'active' member of the Party, and not merely 'a nominal, passive, inactive or purely technical' member, with knowledge of the Party's illegal advocacy and a specific intent to bring about violent overthrow 'as speedily as circumstances would permit'" (at 220, 81 S.Ct. at 1481). In *Scales* the conviction was affirmed. In *Yates* and *Scales,* the principles of *Dennis* are in no way overruled though each opinion does contain detailed and probing elaboration and explication of the intent of the federal Congress in enacting internal security measures and of the meaning and requirements of the federal Constitution and particularly its First Amendment. There is no need for this Court to determine whether Braverman is right in contending that the evidence produced in his 1951 trial would not be sufficient today. In his opinion (at 207, 316 A.2d at 251), Chief Judge Murphy wrote:

* * * We agree with the Maryland State Bar Association that interpretations of the First Amendment now prevailing require that the government show more to obtain a conviction under the Smith Act than was necessary at the time of the *Frankfeld* [*Frankfeld v. United States,* 198 F.2d 679 (4th Cir. 1952), *cert. denied,* 344 U.S. 922, 73 S.Ct. 389, 97 L.Ed. 710 (1953), *reh. denied,* 345 U.S. 913, 73 S.Ct. 652, 97 L.Ed. 1348 (1953)] decision. Braverman's conviction was based essentially upon the same theory

as that advanced by the government, but rejected in *Yates*—that a defendant's participation in a conspiracy to violate the Smith Act could be shown by his active membership in the Communist Party. Although the jury instructions approved in *Frankfeld* were quite broad, and appear to meet the requirements imposed by subsequent cases, *i. e.*, that advocacy of "action" is proscribed and that advocacy of an "abstract doctrine" of forcible overthrow is not; that the defendants must be "active members" with knowledge of the party's illegal purpose; and that each defendant must have the specific intent to overthrow the government by force and violence as speedily as circumstances would permit—a serious question exists whether the evidence adduced against Braverman, apparently adequate to sustain his conviction under *Dennis,* would have been legally sufficient to support his conviction under the standards laid down in *Yates* and *Scales*.

\* \* \*

Some members of this Court disagree with that appraisal—others agree. But the point is not of controlling import in this case. Regardless of the state of the law today, Braverman was fairly and properly tried and convicted in 1951 of a crime of moral turpitude. And to gain readmission to the bar of this Court he must overcome the heavy burden that that continuing status imposes upon him.

### III

To gain readmission to the bar of a court, a disbarred attorney must show that he has been rehabilitated—that a reformation has been accomplished. Commenting upon the same, the three-judge State Court hearing panel wrote (quoted by Chief Judge Murphy 271 Md. *supra* at 202–03, 316 A.2d at 249):

"As to Petitioner's reformation, the Baltimore Bar Association raises the philosophical question of how Petitioner has proven his reformation

when he refuses to recognize the existence of any misconduct from which to reform. Since Petitioner is adamant in his belief in his innocence, he is consistent in not expressing any repentance. While he seems to hinder his cause by not taking what might be the easier way of confession and contrition, the intellectual honesty of his position must be recognized. Reform has been defined as: to change from worse to better, to bring from a bad to a good state. We believe Petitioner has demonstrated his reformation without an expression of contrition from him. Starting from the premise that his guilt was conclusively proven, we find his conduct since conviction to be a complete turnabout from that which resulted in his conviction. We find his conduct since conviction to be totally inconsistent with the probability of repetition of his previous misconduct. We believe this constitutes reformation as this term is used in the present proceedings.

\* \* \* \* \* \*

"We find the impressive and unchallenged evidence presented by Petitioner of his present good character clearly establishes his eligibility for reinstatement on this score."

Braverman stated during the hearing in this Court:

\* \* \* My understanding was there was no evidence in any way linking me to the concept of force and violence \* \* \*.

That is not entirely accurate. There was testimony given by Mrs. Mary Markward that all of the defendants "advocated the use of force and violence" (Transcript of Trial before Judge Chesnut pp. 1475–76). Judge Chesnut did indicate at one point during the trial that there had been no evidence that Braverman "had been *given* to force and violence in connection with the case" (*id.* at 2137) (emphasis supplied). And there is no evidence in any part of the transcript of the remainder of the proceedings which indicates in any way to

the contrary. But there was the testimony of Mrs. Markward that Braverman had advocated violence. Whether it was abstract advocacy of the type labelled as not sufficient in *Yates* and *Scales* does not need determination herein. For as stated above Braverman was convicted under the *Dennis* standard and before the Supreme Court further explicated those standards in *Yates* and *Scales*. Further, Braverman was convicted only of conspiracy and not of anything else.

But Braverman not only denies that he personally engaged in violence—he also denies he ever advocated or endorsed it. He maintains the jury should have believed him in that regard. He has always proclaimed, and continues to proclaim, his innocence even under the *Dennis* standard. Assuming his credibility in that regard, respect for what the State Court hearing panel has labelled as his "intellectual honesty" clearly indicates that he cannot be expected to admit culpability if he truthfully is continuing to deny the same.

### IV

That brings this Court to the issue of Braverman's credibility. For if this Court concludes that Braverman has been and is dissembling, he cannot be readmitted to the bar of this Court. Before the hearing panels of the State Court and of this Court, Braverman indicated that he did not understand the Communist classics to preach the use of violence. In the State Court proceeding, discussing *Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), he stated (Tr. 8–9):

I think the first thing that impressed me and really created an interest in the case was the fact that Schneiderman was represented without fee before the Supreme Court by Mr. Wendell Willkie, and Mr. Willkie had been the Republican nominee for President and was a man of great prestige and certainly one of the leading attorneys in the country, and this action on the part of Mr. Willkie created a great deal of interest in me. In the first place—and I read the *Schneiderman* case and Schneiderman was a high official of the Communist party and came to this country about 1908 when I was a child. He joined the Communist party in '22 and in 1927 became naturalized in one of the federal district courts and, like all other naturalized citizens, took the oath to uphold the Constitution and give good faith and allegiance to the Constitution; and some twelve years later in 1939 the Government, the Department of Justice, brought an action roughly called De-Naturalization Proceeding or proceedings to have Schneiderman's certificate of naturalization set aside because the Government said it was illegally procured because of his membership in the Communist party. He could not give a valid oath and allegiance to the Constitution and the Supreme Court, in a very lengthy and what I thought a well-reasoned and one of the finest reasons I have ever read as a piece of literature and law, held that being a member of the Communist party was not incompatible to the oath of allegiance to the United States.

And in this Court Braverman testified that before he joined the Communist Party, he had read *Schneiderman* and parts of Lenin and Marx and " * * * never came across where force and violence as a way of achieving change was ever heard * * * ". And in a published transcript of a question and answer session at the Law School of the University of Maryland held after his readmission to the Maryland bar, Braverman stated:

* * * And, as a matter of fact, it was because I was assured by the Supreme Court in the *Schneiderman* case that the Communist Party did not be-

lieve in force and violence that I joined the Communist Party. * * *[3]

More than one—if not all—of the members of this Court have been given considerable pause by those statements. The Communist classics bristle with reference to force, as Mr. Chief Justice Stone pointed out in his dissenting opinion in *Schneiderman* and as clearly appears from a glance at the quotations from Marx, Engels and Lenin set forth in footnotes 35–39 (320 U.S. *supra* at 149–52, 63 S.Ct. 1333) of Mr. Justice Murphy's majority opinion in that case. But there also appears in the majority opinion the following passage (at 157, 63 S.Ct. at 1352):

A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open.

Braverman's own expressions of his philosophy while he was a Communist Party member tend to accord with that view. Further, he insists that the use of force and violence has always been foreign and even inimical to his views and to his nature. Hard as it may be to remember and understand today, there were starry-eyed persons who in the 1930's and even in the 1940's and beyond believed—and perhaps even today believe—that in this great democracy of ours, Communist principles should triumph by way of the ballot box and will do so if our democratic governmental machinery is permitted to function.

Braverman may have been one of those persons. On the other hand, he may have been one who advocated forcible overthrow of our Government. If so, he violated his oath, taken upon his admission to this Court, to support the Constitution of the United States. If so, he is not telling the truth today.

All of the testimony available to this Court supports the belief that Braverman is a useful citizen today. He was once a member of the Communist Party. That alone would not prevent his initial admission to this Court today. Nor does it alone stand in the way of his readmission. But since he stands convicted of a crime of moral turpitude, this Court must convince itself that he has rehabilitated himself. And if he did advocate violence as a member of a conspiratorial group—a course of conduct of which he was fairly and properly convicted—he should not be readmitted to this Court unless (a) he admits his wrongdoing and convinces this Court that he regrets it and will never return to it or (b) he convinces this Court he honestly believes he never advocated violence in the context of which he was convicted. If (b) is the fact, Braverman cannot be expected to admit wrongdoing regardless of his conviction.

What it all adds up to is this: this Court will never know for certain that status (b) exists. But *certainty* is not required and indeed is probably seldom if ever entirely possible where the credibility and reliability of a human being is concerned. The State Courts have endorsed Braverman's credibility and reliability, as have the Maryland State Bar Association and leading attorneys and citizens of Maryland. There has been no attack in any proceeding known to this Court since Braverman's conviction in 1952 upon his credibility or reliability. His record of community participation is most commendable. In all, his present credentials are impressive. In that light, Braverman has met

3. *A Meeting with Maurice Braverman*, 4 U.Md.L.Forum, 98, 99 (1974).

the strict burdens inposed upon him and is entitled to have this Court grant his application for reinstatement to the bar of this Court.*

* In his separate opinion Judge Miller has written that "Judge Kaufman would resolve that issue [that is, whether Braverman honestly believes he never advocated violence in the context in which he was convicted] by granting the benefit of any doubt on the matter to Braverman * * *." That is not the position of this dissent. Rather, that position is only that Braverman has met the burdens which he is required to meet and that he is not under the burden of establishing his own reliability and credibility with certainty, since a human being can seldom so do. While the three-judge panel of this Court in acting as an arm of this Court in conducting the initial hearing has performed an effective service for the Court, that in no way relieves any other member of this Court of his individual fact-finding responsibility. Each dissenting member of this Court has himself listened to the tape of the hearing and has made his own individual evaluation of the testimony of Braverman at that hearing, in the light of the entire record in this case, which contains everything which is referred to on page 810, *supra*, of this dissenting opinion. In the opinion of the three judges who dissent herein, nothing which took place during the hearing before the three-judge panel of this Court detracts significantly from the overwhelming evidence in Braverman's favor which led the Courts of the State of Maryland to act as they have done.